**Dr. Phyllis MULLENIX, Plaintiff,**

v.

**FORSYTH DENTAL INFIRMARY FOR CHILDREN, Forsyth Dental Center, Forsyth Research Institute and Ronald J. Gibbons, Director, Defendants.**

**Civ. A. No. 94–10449–PBS.**

United States District Court, D. Massachusetts.

Nov. 13, 1996.

---

Andrea M. Di Fabio, Rosemary Connolly, Robins, Kaplan, Miller & Ciresi, Boston, MA, for plaintiff.

Douglas F. Seaver, Laurie C. Buck, Warner & Stackpole, Boston, MA, for defendants.

SARIS, District Judge.

**REPORT AND RECOMMENDATION RE: DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT (DOCKET ENTRY # 92); PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON COUNTS III AND IV OF THE THIRD AMENDED COMPLAINT (DOCKET ENTRY # 96)**

August 14, 1996

BOWLER, United States Magistrate Judge.

Pending before this court are two motions for partial summary judgment filed in the above styled employment discrimination case. Defendants Forsyth Dental Infirmary for Children, Forsyth Dental Center and Forsyth Research Center (collectively: "Forsyth") move for summary judgment on certain claims in Count I of the third amended complaint ("the amended complaint") and on counts III, IV and V of the amended complaint.[1] (Docket Entry # 92). Plaintiff Dr. Phyllis Mullenix ("Dr. Mullenix"), a former Forsyth employee, seeks summary judgment on the federal and state equal pay claims in counts III and IV of the amended complaint. (Docket Entry # 96). After conducting a hearing and allowing the parties an opportunity to submit additional documents, this court took the summary judgment motions (Docket Entry # # 92 & 96) under advisement.

---

1. Forsyth's pleadings are not entirely clear in identifying whether its summary judgment motion and supporting memorandum apply, in whole or in part, to Count II. Count II alleges a cause of action under Massachusetts General Laws chapter 151B ("chapter 151B").

The motion for summary judgment begins by seeking summary judgment on the equal pay and retaliatory discharge claims in Count I, the federal and state equal pay claims in counts III and IV and the hostile work environment claim in Count V. Notwithstanding this omission of Count II, the actual motion contends that plaintiff Dr. Phyllis Mullenix' claims "under ... M.G.L. c. 151B ... fail as a matter of law." (Docket Entry # 92, p. 1). Moreover, the motion for partial summary judgment concludes, in part, by requesting summary judgment on the retaliation claims under chapter 151B in Count II. (Docket Entry # 92, p. 3).

The supporting memorandum, however, fails to discuss Forsyth's liability under chapter 151B. (Docket Entry # 93). This failure is consistent with the representation in the motion listing the counts over which Forsyth moves for summary judgment and omitting Count II (Docket Entry # 92, p. 1). The only reference in the supporting memorandum to chapter 151B appears in footnote number one which requests summary judgment on the equal pay violations and retaliatory discharge claims in counts I and II. The conclusion to the supporting memorandum conspicuously omits any reference to Count II and/or chapter 151B. (Docket Entry # 93). Where, as here, the moving party apparently seeks summary judgment on a claim (Count II for violation of chapter 151B) where the plaintiff bears the underlying burden at trial, the nonmovant need only set forth the absence of evidence to support the plaintiff's case. Here, however, Forsyth completely fails to set forth an argument under Count II and this court therefore assumes that it either made a typographical error in referring to chapter 151B or, alternatively, that it fails to set forth an adequate basis for summary judgment on Count II. Summary judgment is therefore unwarranted on Count II.

## PROCEDURAL HISTORY

The amended complaint alleges that Forsyth discriminated against Dr. Mullenix on the basis of her sex, denied her equal pay and one or more promotions and retaliated against her for seeking legal redress during her employment at Forsyth as a Staff Associate from 1982 to 1994. (Docket Entry # 59). Count I of the amended complaint alleges a violation of 42 U.S.C. § 2000e *et seq.* ("Title VII") and the subsequent 1991 amendment thereto. Forsyth seeks summary judgment on the retaliation and equal pay claims in Count I.[2]

Count III sets forth a cause of action under the federal Equal Pay Act ("the EPA"), 29 U.S.C. § 206(d), and Title VII based on the disparity in compensation between male and female staff associates at Forsyth. Count IV alleges a violation of the Massachusetts Equal Pay Act ("the MEPA"), Massachusetts General Laws chapter 149, section 105A. Count V relates a hostile work environment claim under Title VII. (Docket Entry # 59). Forsyth moves for summary judgment on the EPA, the Title VII and the MEPA equal or comparable pay claims in counts I, III and IV and the hostile work environment claim in Count V. (Docket Entry # 92). Dr. Mullenix cross moves for summary judgment on the EPA claim in Count III and the MEPA claim in Count IV. (Docket Entry # 96).

## I. *DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT (DOCKET ENTRY 92)*

### *FACTUAL BACKGROUND*[3]

Dr. Mullenix holds a doctoral in pharmacology from the University of Kansas Medical Center where she studied a number of drugs used in dentistry. (Docket Entry # # 59 & 84, ¶¶ 1; Docket Entry # 98, Mullenix Deposition). She received post doctoral training at Johns Hopkins University (Docket Entry # 98, Mullenix Deposition). Dr. Mullenix has authored or co-authored at least 23 articles[4] and three chapters in various books. (Docket Entry # 97, Ex. 7).

In 1982, prior to working at Forsyth, Dr. Mullenix worked as a research associate at the Children's Hospital Medical Center ("Children's Hospital") in Boston. Children's Hospital had a dental department at the time of Dr. Mullenix' employment. While at Chrildren's Hospital, Dr. Mullenix engaged in research with a number of individuals at the Harvard School of Dental Medicine.

Dr. Mullenix also worked as an instructor in neuropathology and in psychiatry at the Harvard Medical School ("Harvard"). She received a salary and primarily performed research as an instructor at Harvard. (Docket Entry # 98, Mullenix Deposition)

Dr. Mullenix first considered joining Forsyth in 1981 and 1982. (Docket Entry # 98, Mullenix Deposition). Dr. John Hein ("Dr. Hein"), Director of Forsyth Dental Center from 1962 to 1991, initially invited Dr. Mullenix and Dr. Paul Moore ("Dr.Moore"), a pharmacologist at the Harvard School of Dental Medicine, to give a seminar. Impressed by Dr. Mullenix' work, Dr. Hein asked Dr. Mullenix if she would be interested in doing full time research at Forsyth rather than the type of research she was performing at Harvard. Prior to hiring Dr. Mullenix, Dr. Hein viewed Dr. Mullenix' academic and work record as excellent. Similarly, Dr. Mullenix was impressed with Dr. Hein before she began working at Forsyth. (Docket Entry # 98, Mullenix Deposition & Hein Deposition).

By letter dated July 29, 1982, Dr. Hein informed Dr. Mullenix of her appointment as a staff associate in the pharmacology department of the Forsyth Dental Center. (Docket

---

2. Forsyth does not move for summary judgment on the denial of promotion claim in Count I. The Title VII unequal pay claim in Count I appears duplicative of the Title VII unequal pay claim in Count III.

3. The factual summary is taken from the exhibits and affidavits submitted in support of the cross motions for summary judgment. Disputes, where applicable, are noted. In addition, although this court generally summarizes the record in Dr. Mullenix' favor for purposes of resolving Forsyth's motion for summary judgment, this court views the record in Forsyth's favor for purposes of resolving Dr. Mullenix' motion for summary judgment.

4. The majority of these articles are published.

Entry # 97, Ex. 10). Dr. Hein believed that the appointment was full time appointment.[5] It was also his understanding that Dr. Mullenix' income depended on her receipt of grant funding "just like anybody else." (Docket Entry # 98, Hein Deposition). Likewise, Dr. Mullenix avers that she understood her responsibilities as similar to every other staff member, i.e., to write grant proposals and to obtain external funding. (Docket Entry # 102, Mullenix Affidavit).

Dr. Hein either could not recall or did not believe that he recommended that Dr. Mullenix receive a salary supplement during his tenure as Director. He intimated that the salary sheets would not reflect a salary supplement either because Forsyth had not received full funding in her research area or because she was not performing a special service for Forsyth such as a chairman of the animal house committee. (Docket Entry 98, Hein Deposition). Dr. Mullenix, however, eventually served on the Animal Care and Safety Committee during her employment at Forsyth. (Docket Entry # # 59 & 84, ¶¶ 11; Docket Entry # 98, Gibbons Deposition).

In a separate letter dated July 29, 1982, Dr. Hein advised Dr. Mullenix that, at a July 29, 1982 meeting of senior members of the staff ("senior staff members"),[6] the senior staff members were significantly impressed with the behavioral toxicology research she was performing with Dr. Moore. Dr. Mullenix' research at the time involved examining the impact of low levels of exposure of chemical agents on the brain. The second July 29, 1982 letter additionally apprised Dr. Mullenix, however, that the senior staff members were uneasy about making a longterm com-

mitment to Dr. Mullenix due to the novelty of research in behavioral toxicology and its long term application to the dental area. (Docket Entry # 94, A–69; Docket Entry # 98, Hein Deposition).

In 1982 a full time appointment as a staff associate at Forsyth Dental Center was ordinarily for a 12 month time period. According to Dr. Hein, Forsyth Dental Center guaranteed the annual salary of a staff associate if the individual had a 12 month appointment. (Docket Entry # 98, Hein Deposition). Under Forsyth Dental Center's written procedures for appointment in effect from 1982 to April 1993, the designation of an appointment as full time applied where an individual spent at least 80% of his professional time at Forsyth Dental Center and received at least 50% of his salary from Forsyth's general resources. (Docket Entry # 97, Ex. 6; Docket Entry # 94, A–81).

Dr. Ronald Gibbons ("Dr.Gibbons"), Director of Forsyth Dental Center beginning in 1991 and a senior staff member prior to 1991, described the staff associate position as "a catch-all type of position" comprised of individuals whose salary depended completely on external grant funding as well as individuals whose salary Forsyth Dental Center supported with internal resources. (Docket Entry # 94, A–19). The above noted written procedures for appointment included part time and full time appointments for a staff associate position. (Docket Entry # 97, Ex. 6). In April 1993, when Forsyth Dental Center revised its written appointment procedures (Docket Entry # 94, A–81), it categorized the staff associate position as a non-

---

**5.** When viewing the record in Forsyth's favor, however, it is worth noting that the written procedures for appointment in effect at Forsyth Dental Center in 1982 also designated the position of staff associate as a part time position applicable to individuals who spent less than 80% of their professional time at Forsyth Dental Center and who received less than 50% of their salary from Forsyth's general resources. Indeed, the staff associate position was the only appointment for part time individuals. A staff associate appointment therefore included individuals whose salary was dependent on grant funding as well as other individuals whose salary was partially supported by Forsyth. (Docket Entry # 94, A–19; Docket Entry # 97, Ex. 6).

Again viewing the record in Forsyth's favor, Dr. Ronald Gibbons ("Dr. Gibbons"), who became Director of Forsyth Dental Center in 1991 and was a senior staff member from approximately 1976 to 1991 (Docked Entry # 98, Gibbons Deposition), understood that Dr. Mullenix was a part time employee in 1991. (Docket Entry # 110, Ex. C).

**6.** Appointments to the rank of senior staff member at the Forsyth Dental Center are tenured positions without a time limit. Forsyth can terminate such an appointment only in the event of gross or grave misconduct or neglect of duty. (Docket Entry # 97, Ex. 6; Docket Entry # 94, A–85).

tenure track, part time appointment.[7] Forsyth Dental Center essentially gave staff associates the opportunity to develop an institutional research program, according to Dr. Gibbons. (Docket Entry # 98, Gibbons Deposition).

Dr. Anne Tanner ("Dr.Tanner"), a longtime Forsyth employee who became a senior staff member in 1989, testified that the duties of a staff associate in 1994 consisted of researching, writing manuscripts, obtaining independent funding and attending seminars. (Docket Entry # 98, Tanner Deposition). In deciding whether to reappoint an individual to a staff associate position, Dr. J. Max Goodson ("Dr.Goodson"), a senior staff member since 1981, noted that a staff associate was expected to make scientific contributions and to have his research funded. (Docket Entry # 98, Goodson Deposition). Dr. Hein testified that the requirements for a staff associate varied but that Forsyth Dental Center generally expected the individual to have an advanced degree and, once hired, to develop an area of research and possibly a department. (Docket Entry # 98, Hein Deposition). Consequently, although the nature of the research may have differed between the various staff associates at Forsyth Dental Center, they had the common duties of acquiring external research funding, performing research and possibly establishing a department.[8]

Forsyth[9] is a nonprofit, Massachusetts corporation with a principal place of business in Boston. It employs more than 20 employees and engages in medical and scientific research. (Docket Entry # # 59 & 84, ¶¶ 2). Forsyth is comprised of three divisions, The Forsyth School of Dental Hygienists, The Research Institute and the Infirmary Division, and thereby combines "basic research with clinically important oral health problems." Its overall mission is to improve children's oral health. More specifically, The Research Institute conducts basic and applied biomedical research programs geared to better understanding and preventing oral diseases. (Docket Entry # 94, A–113).

In August 1982 Dr. Mullenix relocated from Harvard to Forsyth's facilities in Boston. She did not receive compensation from Forsyth in 1982 and does not remember receiving compensation from Forsyth in 1983. In 1983 Dr. Mullenix began writing a grant proposal for a computer recognition system whereby a computer would detect levels of neurotoxicity in the brain. Thereafter, she obtained a gift from the American Petroleum Institute to develop a computer pattern recognition system.[10] In or around this time, Dr. Mullenix also acquired funding gifts for Forsyth from the Mobil Oil Corporation. (Docket Entry # 98, Mullenix Deposition; Docket Entry # 94, A–43).

In April 1983, at the suggestion of Dr. Mullenix, Forsyth Dental Center formally recognized Dr. Mullenix' work by creating a separate department in toxicology. Dr. Mullenix acquired the title of Head of the Department of Toxicology. Forsyth, however, often created separate departments for staff associates in their area of research in order to assist with their applications for grant

---

7. Dr. Donald Hay ("Dr.Hay"), a longtime Forsyth Dental Center employee, testified that Dr. Mullenix remained under the pre–1993 system of appointments. As of April 1993, the pre–1993 full time staff associate position became the tenure track position of a research associate. (Docket Entry # 98, Hay Deposition; Docket Entry # 97, Ex. 15).

8. There was also a common salary range for staff associates.

9. Throughout the depositions, the deponents referred to Forsyth and Forsyth Dental Center interchangeably. Consequently, this opinion refers, at various times, to Forsyth when in actuality the deponent is more than likely referring to Forsyth Dental Center.

10. Kevin M. Flaherty ("Flaherty"), Dr. Mullenix' expert accountant, compiled a chart reflecting that Dr. Mullenix' grant and contract from the American Petroleum Institute totaled $71,446 for the years 1984 and 1985. The chart also shows that between 1985 and 1989 Dr. Mullenix acquired a $36,000 gift for Forsyth from the AMOCO Foundation.

Dr. Mullenix' grant in the form of gifts to Forsyth from the Mobil Oil Corporation from 1984 to 1988 totaled $60,000. Flaherty's chart, compiled from data supplied by Forsyth, the Department of Human Health and Services and certain correspondence, further reflects that Dr. Mullenix obtained a $90,000 grant in the form of a gift from the Digital Equipment Foundation. (Docket Entry # 97, Ex. 9).

funding. An estimated one quarter to one third of the departments at Forsyth Dental Center had only one person. The head of a department generally had the responsibility of overseeing the receipt of the funds necessary to support the salaries of himself and the members of his department. By 1991 the toxicology department included at least one other employee in addition to Dr. Mullenix. (Docket Entry # 94, A–30 & A–37; Docket Entry # 97, Ex. 4; Docket Entry # 98, Gibbons & Szeto Depositions).

In 1984 Forsyth began supporting Dr. Mullenix' salary at an estimated $1,000 per month through a grant obtained for Forsyth by Dr. Moore. (Docket Entry # 94, A–70). Dr. Mullenix acquired additional grants from various sources between 1984 and 1989. (Docket Entry # 97, Ex. 9; Docket Entry # 94, A–176). On April 30, 1989, however, Forsyth Dental Center issued a document entitled "TERMINATION" to Dr. Mullenix due to lack of funding. Excluding a grant from the National Institute of Health ("NIH") for the 1990/1991 year, Flaherty's analysis reflects that Dr. Mullenix only generated $6,867 through a contract grant from Dynagen, Inc. in 1990. The termination notice includes a check box indicating that Forsyth Dental Center would, if possible, rehire Dr. Mullenix. Consequently, when Dynagen, Inc. awarded Dr. Mullenix the $6,867 contract grant, Forsyth rehired Dr. Mullenix for a brief period of time. (Docket Entry # 101, Ex. J; Docket Entry # 94, A–55, A–79 & A–176).

On March 2, 1990, Dr. Mullenix applied for state unemployment compensation. The state Department of Employment and Training mailed a notice of approval of the claim on March 19, 1990. (Docket Entry # 94, A–79 & A–80; Docket Entry # 101, Ex. J). Forsyth later reinstituted Dr. Mullenix' salary and, although the record is contradictory, she apparently received a salary of approximately $30,000 to $30,300 in 1991.[11] (Docket Entry # 110, Ex. E; Docket Entry # 97, Ex. 9).

Dr. Mullenix attests that prior to 1991 she received a level of salary support from Forsyth as a staff associate that was consistent with Forsyth's practice of supporting professional staff salaries. (Docket Entry # 102, Mullenix Affidavit). The salary scale in effect at Forsyth Dental Center for the 1991 fiscal year set a salary range of $20,000 to $60,000 for staff associates. (Docket Entry # 110, Ex. D). Dr. Mullenix' 1991 salary fell within this range.

Dr. Gibbons, who became Director of Forsyth Dental Center in 1991 (Docket Entry # 98, Gibbons Deposition), testified that in 1991 Dr. Mullenix was paid the salary of a part time employee.[12] He further stated that the NIH grant only paid her a 50% salary. (Docket Entry # 110, Ex. C). As previously noted, Forsyth Dental Center's appointment procedures in 1991 and up to April 1993 classified full time appointments, including staff associate appointments, as those employees who had "at least" 50% of their salary paid for from Forsyth resources and who spent at least 80% of their professional time at Forsyth Dental Center. (Docket Entry # 97, Ex. 6). An internal memorandum dated October 30, 1992, reads that "Forsyth professional staff," as opposed to staff associates per se, "are expected to engage in research activities a minimum of 4 days per week (80% time), for which Forsyth guaran-

---

**11.** Dr. Mullenix primarily focuses on her treatment at Forsyth Dental Center during and after 1991. At the hearing on the summary judgment motions, counsel for Dr. Mullenix argued that there was a vast change in Forsyth's treatment of Dr. Mullenix when Dr. Gibbons became Director in 1991. Accordingly, Dr. Mullenix bases her Title VII claim on her treatment at Forsyth from 1990 to 1993. (Docket Entry # 102). With respect to the EPA, Dr. Mullenix limits her claim to the years 1993 and 1994. At the summary judgment hearing, Dr. Mullenix' counsel represented that the state equal pay act claim only involved the year 1994. Dr. Mullenix filed her charge of discrimination with the Massachusetts Commission Against Discrimination in September 1993.

Forsyth, however, prefers to emphasize Dr. Mullenix' salary level and treatment at Forsyth Dental Center from the time of her hiring in July 1982. The parties' respective experts address their reports to these differing time periods. Examining the different time periods yields a different picture of Dr. Mullenix' treatment at Forsyth. This court has considered both time periods in reaching a recommendation on the summary judgment motions.

**12.** See footnote number five.

tees salary support." (Docket Entry # 102, Ex. 21). At times, Forsyth Dental Center paid all or a portion of the salaries of its staff associates. (Docket Entry # 97, Ex. 3, No. 20). For example, in fiscal year 1989 Forsyth Dental Center paid Dr. Mullenix $10,924 in income.

Between 1991 and 1993 Dr. Mullenix received a significant amount of federal funding for her work at Forsyth. Respectively, for the years 1990/1991, 1991/1992 and 1992/1993, Dr. Mullenix obtained grants from the National Cancer Institute, a division of the NIH, for Forsyth amounting to $214,384, $212,896 and $257,051, according to Flaherty.[13] (Docket Entry # 97, Ex. 9).

Dr. Mullenix' NIH research between in 1990 and 1993 involved studying the neurotoxicity of drugs used in the treatment of leukemia. In particular, she studied the prolonged effect on the central nervous system of drugs commonly administered to children afflicted with acute lymphoblastic leukemia. (Docket Entry # 125, Ex. D; Docket Entry # 110, Ex E(1); Docket Entry # 98, Gibbons Deposition). She additionally researched the toxic effects of fluoride. (Docket Entry # 98, Gibbons Deposition) Specifically, Dr. Mullenix collaborated with Dr. Pamela K. DenBesten ("Dr. DenBesten"),[14] a former Forsyth employee, in conducting experiments and researching the neurotoxicity of fluoride in

rats. They published the results of their research in a scientific journal. Dr. Mullenix also conducted a seminar at Forsyth on the fluoride project. (Docket Entry # 98, DenBesten Deposition).

Dr. Mullenix was the principal investigator on the NIH grants. A principal investigator prepares the grant proposal, qualifies to perform the necessary research, submits the completed application to the federal government for funding and oversees the budget upon receipt of a grant award. (Docket Entry # 98, Hein Deposition).

From 1990 to 1993 Dr. Mullenix listed her salary as principal investigator at a level of 50% on the NIH grant applications. For example, in the 1992/1993 year, Dr. Mullenix requested a $32,286 salary at 50% effort together with $7,426 in fringe benefits on the NIH grant application. Mullenix avers that the Director at Forsyth Dental Center had to approve all salary rates in grant applications. (Docket Entry # 102, Mullenix Affidavit; Docket Entry # 101, Ex. D; Docket Entry # 94, A–75 & A–78).

Forsyth Dental Center paid Dr. Mullenix an estimated salary of $31,512.56 in 1992 and $24,835 in 1993.[15] (Docket Entry # 97, Ex. 9). Dr. Mullenix' and Forsyth's experts disagree as to the level of funding Dr. Mullenix generated in relation to her salary versus the

**13.** With respect to the $257,051 NIH grant, Arthur D. Marcotti ("Marcotti"), Assistant Treasurer and Controller of Forsyth Dental Center, represents that the NIH grant award totaled only $239,821. Marcotti further states that $239,821 plus $7,230 equals $257,051 and that Flaherty erroneously reported $17,330 as new income. (Docket Entry # 110, Ex. E). Marcotti's arithmetic appears incorrect. Furthermore, even if the grant award was $239,821 it would not alter this court's resolution of the summary judgment motions.

**14.** Dr. Mullenix represents that Dr. DenBesten has a Ph.D. in pediatric dentistry. (Docket Entry # 97, n. 3).

**15.** Forsyth reasons that because Dr. Mullenix listed her salary at salary at 50% effort on the NIH grant applications, her annual salary, in comparison to other male staff associates, is double the amount she actually received. (Docket Entry # # 93 & 101). It is true that at Forsyth Dental Center a portion of an employee's salary was often paid from funds generated by grant awards. It is also true that Dr. Mullenix generat-

ed a significant amount of funds from grant awards between 1991 and 1993 and, in the course of applying for these awards, she listed her salary at a 50% effort. Dr. Mullenix, however, did not work for NIH during this time period. Rather, she worked for Forsyth Dental Center. Thus, it was Forsyth Dental Center which set her salary not Dr. Mullenix in the course of applying for grant awards from NIH. Moreover, viewing the record in Dr. Mullenix' favor, Dr. Gibbons testified that the Director and the Board of Trustees established the guidelines for the maximum level of the salary of a principal investigator listed on a grant application.

On the other hand, as noted by Dr. Gibbons, Dr. Mullenix' salary partly depended upon her obtaining a sufficient amount of external funding through grant awards. (Docket Entry # 98, Gibbons Deposition). Dr. Hein similarly testified that it was the responsibility of the head of each department to acquire sufficient funds to support the department and the salary of the head of the department. (Docket Entry # 94, A–30).

level of funding generated by other Forsyth Dental Center employees and/or staff associates in relation to their salaries. (*Cf.* Docket Entry # 97, Ex. 9; Docket Entry # 94, A–169–174).

Flaherty, Dr. Mullenix' expert accountant, prepared a graph listing the amount of government funding, the salary and the position of the salaried employee for a group of 26 Forsyth Dental Center employees for the years 1990 to 1993.[16] According to Flaherty's analysis, Dr. Mullenix generated the highest level of government funding ($684,331) of any staff associate in the years 1990 to 1993. Indeed, the second highest level of government funding generated by a staff associate was only $58,548 for the years 1990 to 1993. Furthermore, Dr. Mullenix' aggregate salary ($100,924) was far less than the aggregate salary for Forsyth employees generating similar levels of government funding and was the lowest aggregate salary of the four staff associates listed in the graph for the years 1990 to 1993. (Docket Entry # 97, Ex. 9). In contrast, Forsyth's expert points out that the ratio of aggregate wages to governmental funding for the 26 employees is the highest for two female staff associates, albeit not Dr. Mullenix. (Docket Entry # 94, A–170).

Flaherty also compared the amount of internal funding which Forsyth Dental Center provided to its employees irrespective of the external grant funding for the years 1990 to 1993. Dr. Mullenix ranks second to last on a list of 23 Forsyth Dental Center employees and also ranks as the lowest paid staff associate on the list. For instance, while the other two staff associates received $146,152 and $62,226 during this time period, Dr. Mullenix only received $2,704. (Docket Entry # 97, Ex. 9). Again, Forsyth's expert disagrees with Flaherty's analysis and therefore compares the time period from the date of the employee's hire to 1993. Such an analysis results in Dr. Mullenix ranking in the middle of the group of 23 Forsyth Dental Center employees. (Docket Entry # 94, A–170).

The experts also disagree about the appropriate time period to compare the male and female salaries of staff associates at Forsyth Dental Center. Flaherty examines the average annual salaries of staff associates and other categories of employees for the years 1991 to 1994. Flaherty's comparison shows that Forsyth Dental Center paid female staff associates an average salary of $25,048 in 1991, $2,193 less than the average salary of male staff associates. In 1992, however, female staff associates received an average of $4,225 more than male staff associates. In 1993 and 1994 female staff associates respectively received $3,077 and $4,572 less than male staff associates, according to Flaherty's calculations. (Docket Entry # 97, Ex. 9).

Forsyth's expert submits that these differences are statistically insignificant. He also exhibited a chart reflecting that the annual salaries of female staff associates exceeded the annual salaries of male staff associates in 1986, 1987, 1988 and 1989. (Docket Entry # 94, A–172 & A–173).

Forsyth trustees generally set certain salary guidelines for Forsyth employees each year.[17] Ordinarily, Forsyth gave employees annual salary increases of 4%. The trustees as well as the Director also determined the appropriate salary level of a principal investigator on a grant proposal, according to Dr. Gibbons.[18] (Docket Entry # 98, Gibbons Deposition).

The number of staff associates at Forsyth Dental Center was not large. Between 1991 and 1994 Forsyth Dental Center employed approximately four to five male staff associates and five to seven female staff associates. (Docket Entry # 97, Ex. 9; Docket Entry # 94, A–177).

16. Flaherty prepared the graph from payroll distribution data and NIH records. (Docket Entry # 97, Ex. 9). In addition, this court has considered the deposition testimony of Flaherty regarding his qualifications as an expert accountant and the scope of his expertise.

17. See footnote number 15.

18. Given the contradictory evidence described in the second paragraph of footnote number 15, the record is disputed. The record also reflects that senior staff members issued recommendations on reappointments and therefore recommendations as to continuations of salary to the Board of Trustees.

In February 1993 Dr. Mullenix discussed receiving a promotion with Dr. Goodson. (Docket Entry # 98, Mullenix Deposition). The tentative agenda for the March 19, 1993 meeting of senior staff members entailed considering Dr. Mullenix and two other employees for promotions. (Docket Entry # 97, Ex. 15). Dr. Gibbons took notes of the meeting which included 11 senior staff members. His notes reflect that one or more senior staff members made certain comments in the course of considering whether to promote Dr. Mullenix to a tenure track position.[19] These comments include that Dr. Mullenix: does not interact routinely with other staff; has erratic grant support; and has a remarkable research record but has not contributed to the area of oral biology.[20] The comments also contain the notation "resent blackmail threat." In explaining this notation, Dr. Gibbons stated that some of the senior staff members resented Dr. Mullenix' indications that she would file a lawsuit if she was not promoted. According to Dr. Gibbons, Dr. Mullenix made it clear that she was making a threat to various unidentified senior staff members.[21] (Docket Entry # 98, Gibbons Deposition; Docket Entry # 97, Ex. 15).

By letter dated March 30, 1993, Dr. Gibbons advised Dr. Mullenix that the senior staff members attending the meeting voted to defer action on the decision of promoting her to a tenure track position.[22] (Docket Entry # 97, Ex. 14). Dr. Gibbons testified that one of the considerations or reasons for deferring action on Dr. Mullenix' request for a promotion was the concern that she was going to bring a legal action. (Docket Entry # 98, Gibbons Deposition).

On April 23, 1993, Dr. Hay, Associate Director of the Forsyth Dental Center Research Institute and a senior staff member (Docket Entry # 101, Ex. L), met with two members of the Board of Trustees. The group discussed both Dr. Mullenix' legal action and her scientific record. (Docket Entry # 98, Hay Deposition; Docket Entry # 97, Ex. 16).

By letter dated May 12, 1993, the National Cancer Institute of the NIH informed Dr. Mullenix that the scientific ranking of her grant application "precludes the probability of the National Cancer Institute making an award." The "cc" notation in the letter indicates that the National Cancer Institute sent a courtesy copy of the letter to Forsyth Dental Center's business office.

Another senior staff meeting took place on June 9, 1993. The agenda included the issue of Dr. Mullenix' appointment. The participants voted to recommend reappointment of Dr. Mullenix albeit with "no enthusiasm." (Docket Entry # 94, A–92).

A subcommittee of the Board of Trustees met on June 22, 1993, to review the matter of reappointing Dr. Mullenix. The subcommittee decided to reappoint Dr. Mullenix to the non-tenure track position of staff associate.

The subcommittee also instructed the Director to sign Dr. Mullenix' renewal grant application after revising the budget to reflect an appropriate salary level. (Docket Entry # 97, Ex. 16). Dr. Mullenix asseverates that in June 1993 she asked Dr. Gibbons to sign her NIH grant application listing her institutional salary at $104,000 and her effort at 75% thereby resulting in a salary of $78,-

**19.** Neither party moved to strike this court's consideration of these notes.

**20.** This court does not consider these comments for the truth of the matters asserted.

**21.** This court does not consider whether Dr. Mullenix in fact made such comments or threats. Rather, this court considers this testimony, as well as Dr. Gibbons' statements explaining his notations, for state of mind and discriminatory intent purposes. *See Talley v. Bravo Pitino Restaurant, Limited,* 61 F.3d 1241, 1249 (6th Cir. 1995); *McKenna v. Weinberger,* 729 F.2d 783, 792 (D.C.Cir.1984); *Moore v. Sears, Roebuck and*

*Company,* 683 F.2d 1321, 1322 (11th Cir.1982); *Contreras v. City of Chicago,* 920 F.Supp. 1370, 1377 n. 2 (N.D.Ill.1996); *Garcia–Paz v. Swift Textiles, Inc.,* 873 F.Supp. 547, 553 (D.Kan. 1995).

**22.** The March 30, 1993 letter also suggested that Dr. Mullenix and "a senior staff representative meet with a mediator to attempt to narrow the gap between your expectations and those of the Senior Staff regarding criteria used for tenure-track appointments." (Docket Entry # 97, Ex. 14). By letter dated April 28, 1993, Dr. Mullenix' attorney at the time wrote to Dr. Gibbons and expressed her appreciation of the mediation offer. (Docket Entry # 94, A–89).

000. (Docket Entry # 102, Mullenix Affidavit). According to Dr. Mullenix, Dr. Gibbons stated that he would not sign the application unless Dr. Mullenix reduced her salary.[23]

By letter dated July 1, 1993, Dr. Gibbons informed Dr. Mullenix of the Board of Trustees' approval of her reappointment. The letter designates the term of Dr. Mullenix' reappointment as being from July 1, 1993 to June 30, 1994. (Docket Entry # 97, Ex. 18). On August 18, 1993, however, the Assistant Treasurer of Forsyth Dental Center informed Dr. Mullenix that her "salary," as opposed to her position, "will be terminated as of August 31, 1993" due to the lack of grant funding. The letter additionally advised Dr. Mullenix that Forsyth Dental Center intended to pay Dr. Mullenix one month's severance pay on September 15, 1993, unless she received grant funding in the interim. (Docket Entry # 97, Ex. 13; Docket Entry # 126, Ex. 4).

From December 1993 through June 1994, the Massachusetts Department of Employment and Training billed Forsyth Dental Center for reimbursable unemployment benefits made to Dr. Mullenix from October 1993 through May 1994. The notice to Forsyth Dental Center approving Dr. Mullenix' claim defines "total unemployment" as any week in which the individual "performs no wage earning services" (Docket Entry # 125, Ex. A). Forsyth admits, however, that Dr. Mullenix was a full time employee at Forsyth through 1993. (Docket Entry # 126, Ex. 1).

In September 1993 the NIH extended Dr. Mullenix' NIH grant to July 31, 1994, and she received $23,741. (Docket Entry # 102, Mullenix Affidavit). On September 3, 1993, Dr. Mullenix filed a charge of discrimination with the Massachusetts Commission Against Discrimination ("MCAD") alleging discrimination on the basis of sex, retaliation and age. She also filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). (Docket Entry # 102, Ex. G; Docket Entry # 94, A–94 & A–95).

In March 1994 Dr. Mullenix filed the present lawsuit. A senior staff meeting occurred on April 19, 1994. After being advised not to let pending litigation influence their decision, the senior staff members unanimously voted not to renew Dr. Mullenix' appointment. (Docket Entry # 97, Ex. 19; Docket Entry # 94, A–21 & A–22; Docket Entry # 103, Gibbons Deposition). Dr. Gibbons prepared the notes or minutes of the meeting. (Docket Entry # 103, Gibbons Deposition). The minutes evidence the following reasons for the decision not to reappoint Dr. Mullenix. First, a number of senior staff members voiced their view that Dr. Mullenix' contributions to the mission of Forsyth and to oral biology were minimal. (Docket Entry # 97, Ex. 19). Dr. Tanner testified that Dr. Mullenix' research was not consistent with the work of other Forsyth employees. (Docket Entry # 98, Tanner Deposition). Second, other senior staff members pointed out that Dr. Mullenix' funding record was inadequate with little external funding for the past year and no grants currently submitted through Forsyth for the future. Third, several senior staff members deemed Dr. Mullenix' publication record mediocre. (Docket Entry # 97, Ex. 19). Dr. Goodson also commented that the type of research performed by Dr. Mullenix was losing favor with the scientific community. Dr. Goodson based this comment on information obtained from a colleague prior to the March 19, 1993 senior staff meeting. (Docket Entry # 98, Goodson Deposition).

By letter dated May 18, 1994, Dr. Gibbons informed Dr. Mullenix that the senior staff members voted not to renew her appointment which terminated on June 30 1994. (Docket Entry # 97, Ex. 2; Docket Entry # 94, A–109 & A–110). The pre-April 1993 appointment procedures which, according to Dr. Hay, remained applicable to Dr. Mullenix after April 1993,[24] provide that a staff associate with a 12 month appointment "will be notified" of a decision not to renew the appointment "six months prior to the end of his

---

**23.** This court does not consider this recitation of what Dr. Gibbons said for the truth of the matter asserted. Instead, this court considers the statement for purposes of showing Dr. Gibbons' state of mind and discriminatory intent. See footnote number 21 and the cases cited therein.

**24.** See footnote number seven.

contract."[25] (Docket Entry # 97, Ex. 6). On May 31, 1994, Dr. Gibbons informed Dr. Mullenix by letter that the Board of Trustees had approved the recommendation of the senior staff members not to renew her appointment. (Docket Entry # 94, A–109).

As already noted, the staff associate's position, as it existed prior to the April 1993 recategorization, consisted of both full and part time individuals. Responsibilities of staff associates included performing research, obtaining external funding, making scientific contributions, attending seminars and/or developing a department.[26] In comparison to male staff associates, Dr. Mullenix had three consecutive years of being a primary investigator on an NTH grant as of the end of 1993. Her scientific contributions are demonstrated, in part, by her history of publishing scientific articles. Viewing the record in her favor, Dr. Mullenix had also achieved a significant level of external funding particularly in the years 1991, 1992 and 1993.

Dr. Mullenix compares herself to a number of male staff associates including the following individuals: John Ahern ("Ahern"), Dr. Serge Dibart ("Dr. Dibart"), Dr. Nadarajah Ganeshkumar ("Dr. Ganeshkumar"), Dr. Yi–Ping Li ("Dr. Li") and Dr. Mark Maiden ("Dr. Maider"). Forsyth hired Ahern as a staff associate in 1981. Ahern's training includes advanced courses in bioelectronics technology and courses related to advanced organic chemistry. In 1981 Ahern had 14 years experience in research related to dentistry and oral biology. At Forsyth, Ahern is not responsible for directly obtaining grant funding. Nor is Ahern responsible for generating his own salary. Rather, he works primarily under the direction of a principal investigator. His salary in 1994 was $35,895. (Docket Entry # 101, Ex. L).

Dr. Dibart, a board certified periodontist, obtained a dental degree in France in 1982 and in the United States in 1989. He is a board certified periodontist. Forsyth hired Dr. Dibart as a staff associate. According to Dr. Hay, Dr. Dibart is not responsible for generating external grant funding. Instead, his responsibilities are to provide clinical services in Forsyth's Periodontal Research Center. Dr. DiBart was not a principal investigator. (Docket Entry # 102, Snapp Affidavit). His 1994 salary was $30,479 for part time work at 80% effort. (Docket Entry # 101, Ex. L).

In September 1993 Forsyth hired Dr. Ganeshkumar as part of its recruiting effort in the area of molecular biology. At Forsyth, Dr. Ganeshkumar assists in preparing grant applications. He has a Bachelor of Dental Surgery degree, a Doctor of Philosophy degree and post-doctoral training in the area of oral microbiology. (Docket Entry # 101, Ex. L). Dr. Ganeshkumar's job at Forsyth was his first job after completing post-doctoral work. (Docket Entry # 102, Snapp Affidavit). According to Dr. Hay, Dr. Ganeshkumar's work on one grant application is equivalent to the work of a "full individual on a grant application." (Docket Entry # 101, Ex. L). As of July 1994, however, Dr. Ganeshkumar had not published any scientific works arising from his work at Forsyth. (Docket Entry # 102, Snapp Affidavit). Grant awards support 70% of Dr. Ganeshkumar's salary. Forsyth supports the remaining 30% of Dr. Ganeshkumar's salary. (Docket Entry # 101, Ex. L).

Forsyth appointed Dr. Li as a staff associate in 1990. He holds a Doctor of Philosophy degree in molecular genetics. Within five years of joining Forsyth, Dr. Li had fully funded his salary as well as the direct and the indirect costs of his research. Prior thereto, he obtained a "FIRST Award" from the NIH, a five year grant intended for newly trained investigators. The award generated 50% of his salary support. Forsyth paid Dr. Li a salary of $52,323 in 1994.

---

25. A June 18, 1993 letter to Forsyth's counsel from Dr. Mullenix' counsel at the time states, in part, that "I understand that your client intends to write an appointment letter to my client informing her that her position at Forsyth will stay the same pending the outcome of mediation, and that Forsyth intends to ask her to leave within a year." (Docket Entry # 94, A–93).

26. Dr. Tanner additionally stated that Forsyth would expect a staff associate to participate in activities associated with the building's organization. (Docket Entry # 98, Tanner Deposition).

(Docket Entry # 101, Ex. L; Docket Entry # 102, Snapp Affidavit).

Forsyth appointed Dr. Maiden as a staff associate in 1990. Dr. Maiden worked as a co-investigator on two grant applications and their subsequent implementation. Dr. Maiden researches periodontal disease in an effort to develop novel therapies to treat the disease. Forsyth provided $5,100 in support of Dr. Maiden's salary in 1991 and $2,600 in support of his salary in 1992. (Docket Entry # 101, Ex. L).

In addition to the foregoing, Dr. Mullenix describes the following incidents as indicative of the purportedly discriminatory treatment she and other women at Forsyth received.[27] For example, at an undetermined time after March 1993, Dr. Mullenix had lunch with Dr. Tanner.[28] During the luncheon meeting, Dr. Tanner "laughingly" suggested to Dr. Mullenix that she wear a short skirt when meeting with Dr. Sig Socransky, a senior staff member.[29] (Docket Entry # 98, Mullenix Deposition). In addition, after the March 1993 decision to defer action on Dr. Mullenix' promotion, Dr. Mullenix spoke with Dr. Van Houte, a senior staff member. Dr. Van Houte expressed the opinion that Dr. Tanner was "promoted because of the affair she had with Sig Socransky and that . . . she did not have the qualifications for being promoted."[30] (Docket Entry # 98, Mullenix Deposition).

Dr. Snapp testified that Dr. Sig Socransky treated her differently when she wore "a skirt and heels." In particular, she stated that he would talk to her for a longer period of time and "have a tendency of pulling the chair out from behind the desk to where we would be sitting face to face as opposed to me hiding my legs under the desk."[31] (Docket Entry # 103, Snapp Deposition).

Dr. Snapp also experienced other incidents at Forsyth in 1991 and, specifically, a telephone call to her from Dr. Richard Niederman ("Dr. Niederman"). According to Dr. Snapp, Dr. Niederman telephoned Dr. Snapp at home where she was working, referred to her by her first name and asked her, "How about a good f——?"[32] Dr. Snapp also attended a dinner with Dr. Niederman with a number of other individuals connected to Forsyth. When Dr. Snapp got into Dr. Niederman's automobile to go to the dinner, Dr. Snapp testified that Dr. Niederman "told me I smelled and looked great and asked me if my blouse was silk."[33] (Docket Entry # 103, Snapp Deposition).

Dr. DenBesten, who left Forsyth's employ in 1992, described Forsyth as "an institution that was built in a time gone by, when guys got together and ran their labs" and where "men felt more comfortable with men." (Docket Entry # 98, DenBesten Deposition). During her employment at Forsyth, Dr. Den-Besten complained to Dr. Ed Moreno ("Dr. Moreno"), a senior staff member, about Takai Aoba ("Aoba"), who Forsyth promoted to senior staff member. According to Dr. Den-Besten, Aoba originally wished to collaborate with Dr. DenBesten but then accused her of sabotaging his research. Viewing the record in Dr. Mullenix' favor, Dr. Moreno's response was that Dr. DenBesten needed to understand that Aoba, who came from Japan, had a certain level of discomfort with women and that in Japan women were viewed as subservient to men. Although individuals at Forsyth were sympathetic to Dr. DenBesten's

---

**27.** She also uses these incidents to support her hostile work environment claim.

**28.** In or around 1983 or 1984, Dr. Tanner complained to Dr. Hein about certain conduct which she viewed as sexual harassment. She received an apology but is unaware of any disciplinary action instituted against the unidentified individual. (Docket Entry # 98, Tanner Deposition).

**29.** Forsyth accepts these statements as true for the purpose of its motion for summary judgment. (Docket Entry # 93, n. 5). In addition, this court considers Dr. Tanner's comment for state of mind and discriminatory animus purposes and not for the truth of the matter asserted. See footnote number 21 and the cases cited therein.

**30.** This court does not consider this statement for the truth of the matter asserted.

**31.** See footnote number 21 and the cases cited therein.

**32.** See footnote number 21 and the cases cited therein.

**33.** See footnote number 21 and the cases cited therein.

complaints about Aoba, "they didn't do anything," according to Dr. DenBesten. Moreno also informed Dr. DenBesten that "he had to side with Aoba" because he "was very productive, where [Dr. DenBesten] was relatively unproductive, and had two children."[34] (Docket Entry # 98, DenBesten Deposition).

Notwithstanding these comments, Dr. Mullenix acknowledged that Forsyth considered a number of other women for promotion. According to Dr. Mullenix, these women, who included Drs. Tanner and DerBesten, received more favorable treatment than Dr. Mullenix received. (Docket Entry # 98, Mullenix Deposition).

### DISCUSSION

#### 1. Summary Judgment Framework

As explained *supra* in the procedural history section, Forsyth seeks summary judgment on Dr. Mullenix' unequal pay claims in Count I under Title VII, in Count III under the EPA and Title VII and in Count IV under the MEPA. Forsyth additionally moves for summary judgment on the Title VII retaliation claim in Count I and the hostile work environment claim in Count V. Accordingly, this opinion addresses *seriatim* the merits of awarding Forsyth summary judgment on the EPA claim, the Title VII unequal pay claim, the MEPA claim, the Title VII retaliation claim and the Title VII hostile work environment claim.

"Summary judgment is appropriate when 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.' " *Barbour v. Dynamics Research Corporation,* 63 F.3d 32, 36–37 (1st Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 914, 133 L.Ed.2d 845 (1996) (quoting Rule 56, Fed.R.Civ.P.). In this respect, a "genuine" issue means that "the evidence relevant to the issue, viewed in the light most flattering to the party opposing the motion, [is] sufficiently open-ended to permit a rational factfinder to resolve the issue in favor of either side." *National Amusements, Inc.*

*v. Town of Dedham,* 43 F.3d 731, 735 (1st Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 2247, 132 L.Ed.2d 255 (1995). Likewise, " 'material' means that a contested issue of fact has the potential to alter the outcome of the suit under the governing law if the dispute over it is resolved favorably to the nonmovant." *Smith v. F.W. Morse & Company, Inc.,* 76 F.3d 413, 428 (1st Cir.1996).

Once the moving party makes a proper showing as to the " 'absence of evidence to support the nonmoving party's case,' the burden of production shifts to the nonmovant." *Dow v. United Brotherhood of Carpenters,* 1 F.3d 56, 58 (1st Cir.1993) (citation omitted). "As to issues on which the summary judgment target bears the ultimate burden of proof, she cannot rely on an absence of competent evidence, but must affirmatively point to specific facts that demonstrate the existence of an authentic dispute." *McCarthy v. Northwest Airlines, Inc.,* 56 F.3d 313, 315 (1st Cir.1995). The role of a summary judgment motion in general "is to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required." *Coyne v. Taber Partners I,* 53 F.3d 454, 457 (1st Cir.1995).

#### 2. The EPA (Count III )

The EPA prescribes that:

No employer . . . shall discriminate . . . on the basis of sex by paying wages to employees . . . at a rate less than the rate at which he pays wages to employees of the opposite sex . . . for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex.

29 U.S.C. § 206(d). Initially under the EPA, the plaintiff must establish a *prima facie* case "that the employer paid different wages to an employee of the opposite sex for substantially equal work." *Byrd v. Ronayne,* 61

---

**34.** See footnote number 21 and the cases cited therein.

**139**

F.3d 1026, 1033 (1st Cir.1995). A *prima facie* showing requires the plaintiff to demonstrate that: "(i) the employer pays different wages to employees of the opposite sex; (ii) the employees perform equal work on jobs requiring equal skill, effort, and responsibility; and (iii) the jobs are performed under similar working conditions."[35] *Tomka v. Seiler Corporation*, 66 F.3d 1295, 1310 (2d Cir.1995); *accord Byrd v. Ronayne*, 61 F.3d at 1033 (the "plaintiff must make a *prima facie* showing that the employer paid different wages to an employee of the opposite sex for substantially equal work"); *Dubowsky v. Stern, Lavinthal, Norgaard & Daly*, 922 F.Supp. 985, 990 (D.N.J.1996) (setting forth same requirements as quoted in *Tomka* for *prima facie* showing). In contrast to the required elements in a Title VII claim, the plaintiff does not have to prove that the employer intentionally discriminated against her on the basis of sex in order to prevail under the EPA. *Tomka v. Corporation*, 66 F.3d at 1310.

In setting forth a *prima facie* case, the plaintiff need not establish that her position is identical to the higher paid position but need only establish "that the two positions are 'substantially equal.'" *Tomka v. Seiler Corporation*, 66 F.3d at 1310. The determination of "substantially equal" ordinarily focuses on the "actual job content, not job titles or descriptions."[36] *Mazzella v. RCA Global Communications, Inc.*, 642 F.Supp. 1531, 1551 (S.D.N.Y.1986), *aff'd*, 814 F.2d 653 (2d Cir.1987); *accord Equal Employment Opportunity Commission v. Grinnell Corporation*, 881 F.Supp. 406, 410 (S.D.Ind.1995) (court examines the duties actually performed rather than the job description or title).[37] For example, different departments within a university may require distinctive skills thereby foreclosing a comparison under the EPA. *See, e.g., Strag v. Board of Trustees*, 55 F.3d 943, 950 (4th Cir.1995) (comparing employees in different academic departments in university improper

inasmuch as departments required distinctive skills). In addition, the existence of a hierarchy of differing levels of staff associates weighs against a finding of substantially equal positions. *See Equal Employment Opportunity Commission v. Grinnell Corporation*, 881 F.Supp. 406, 410–411 (S.D.Ind.1995) (noting the converse that there was no hierarchy of differing levels of sales representatives and therefore finding that the plaintiff had established *prima facie* case). On the other hand, an employer's decision to classify jobs within the same range of compensation "is evidence that the purported differences between the positions may not be substantial." *Tomka v. Seiler Corporation*, 66 F.3d at 1311.

With respect to the first element of a *prima facie* showing, it is appropriate for the plaintiff to compare herself to only one male comparater to determine wage differentials, *Dubowsky v. Stern, Lavinthal, Norgaard & Daly*, 922 F.Supp. at 990 (the plaintiff "need only establish that she was paid less than a single male employee" to prevail on EPA claim), although it is generally unwise to rely on such a small number of comparater[s] particularly in an academic setting. *See Brousard–Norcross v. Augustana College Association*, 935 F.2d 974, 979 (8th Cir.1991) (affirming summary judgment under EPA for employer where the plaintiff's salary was only marginally smaller than one comparater and marginally larger than another comparater in academic setting); *see also Strag v. Board of Trustees*, 55 F.3d at 950 (affirming summary judgment on failure to establish *prima facie* case given absence of more systemic, widespread discrimination and use of improper comparater in university setting).

Once the plaintiff sets forth a *prima facie* case, the defendant "must establish one of the following affirmative defenses: the wage discrepancy resulted from (i) a seniority system, (ii) a merit system, (iii) a system

---

**35.** Forsyth does not maintain that it is not an employer subject to the EPA.

**36.** Accordingly, Forsyth's written procedures for appointment are not determinative to the issue of Dr. Mullenix' *prima facie* showing under the EPA.

**37.** In contrast, it is appropriate to consider the qualifications of the employee filling the comparative jobs when evaluating the merits of the defendant's affirmative defenses. *See Dubowsky v. Stern, Lavinthal, Norgaard & Daly*, 922 F.Supp. at 990.

measuring earnings by quantity or quality of production, or (iv) a differential based on a factor other than sex." *Byrd v. Ronayne*, 61 F.3d at 1033. Acceptable factors "other than sex" include experience, prior salary,[38] education, *Dubowsky v. Stern, Lavinthal, Norgaard & Daly*, 922 F.Supp. at 990 ("[a]cceptable factors other than sex include education, experience [and] prior salary"); *Tomka v. Seiler Corporation*, 66 F.3d at 1312 (acknowledging that male employee's experience may explain salary discrepancy), skills which the employer deems useful to the position, *Mazzella v. RCA Global Communications, Inc.*, 642 F.Supp. at 1551–1552, an unwillingness of the male employee to take a reduction in pay in light of his salary in a prior position, *Strag v. Board of Trustees*, 55 F.3d at 951, and the male employee's proven ability to generate higher revenue for the employer's business, see *Byrd v. Ronayne*, 61 F.3d at 1034 (ability of male attorney to bring in clients to law firm and to generate higher billings constituted affirmative defense under EPA). Forsyth submits that Dr. Mullenix fails to show that she was paid less than a male in a substantially equal position. It also argues that any salary differential was based on a legitimate factor other than sex.

In the case at bar, however, Dr. Mullenix adequately establishes genuine issues of material fact as to whether Forsyth paid its male full time staff associates different wages for substantially equal work. Viewing the record in Dr. Mullenix' favor, she held the position of a full time staff associate appointed for consecutive one year terms. In 1993 and/or 1994 she received a salary lower than a number of other male staff associates, specifically, Ahern, Dr. DiBart and Dr. Li.[39] (Docket Entry # 101, Ex. L). Forsyth generally required its full time staff associates to generate external funding to support their position, to engage in research and to make scientific contributions in the overall area of oral health. Forsyth also demanded that its full time staff associates attend seminars and develop a separate department. In addition, Forsyth Dental Center expected a full staff associate to have an advanced degree.

Dr. Mullenix had an advanced degree, established a department, albeit at her suggestion, and engaged in research, albeit not in an area of utmost concern to Forsyth Dental Center. She also served on the Animal Care and Safety Committee. In 1993 she was a principal investigator in an NIH grant at an effort level of 80%. Dr. Mullenix prepared grant applications as did other male staff associates. Consequently, the record contains sufficient evidence to support a finding that Forsyth paid certain of its male staff associates a salary higher than Dr. Mullenix for substantially equal work.

It is also true, however, that full time staff associates engaged in research in connection with different grant applications. Duties of the positions included interacting with different principal investigators. At times, Forsyth supported its full time staff associates with a significant amount of internal funding and, at other times, it required its full time staff associates to generate their funding entirely from external sources. Moreover, dif-

---

38. Discrepancies in prior salary, however, may reflect the weaker bargaining power of women in the workforce. *See Equal Employment Opportunity Commission v. Grinnell Corporation*, 881 F.Supp. 406, 412 (S.D.Ind.1995) (discussing caution used in Seventh Circuit when considering prior salary). Mindful of this proviso, however, it is also true that salary differentials which stem from unequal starting salaries do not violate the EPA if "justified by one of the four exceptions." *Girdis v. Equal Employment Opportunity Commission*, 688 F.Supp. 40, 48 n. 3 (D.Mass.1987), aff'd, 851 F.2d 540 (1st Cir.1988); *Mazzella v. RCA Global Communications, Inc.*, 642 F.Supp. at 1550 (recognizing that male employee's salary was merely the product of his entry level salary together with annual merit increases).

39. In exhibit one, Dr. Mullenix submits a salary graph depicting the salary amounts of other male staff associates. (Docket Entry # 97, Ex. 1). This court considers exhibit one, which sets forth the salary of Dr. Mullenix in comparison to the salary of various male staff associates, as a chalk for present purposes. Dr. Mullenix does not provide this court with the underlying documents used to prepare the salary graph. References to "FD 1347" and "FD 1348" do not sufficiently identify the source for the cited salaries. Accordingly, the chart is simply a representation made by Dr. Mullenix of the salaries of various male staff associates as opposed to appropriate documentation within the meaning of Rule 56, Fed.R.Civ.P. Dr. Hay, however, provides certain salaries for Ahern, Dr. DiBart and Dr. Li.

ferent grant applications could require different levels of effort.

In sum, in light of such evidence, there are material issues of fact as to whether Forsyth paid Dr. Mullenix less than other male staff associates for substantially equal work even considering the nature of the research setting at Forsyth Dental Center. Whether Dr. Mullenix sets forth a *prima facie* case under the EPA, therefore, is an issue for the finder of fact. This court therefore turns to Forsyth's contention that any salary differential was based on a factor other than sex.

Again, however, the record is disputed. Forsyth points out that it is a research institution. Forsyth also submits that it based the salaries of its staff associates on factors other than sex such as grant funding, contributions to the institution and tenure status. (Docket Entry # # 93 & 110). The experts disagree about the amount of grant funding provided by Dr. Mullenix in comparison to the level of grant funding provided by other staff associates. Furthermore, given the obligation to view the record in Dr. Mullenix' favor, she generated a significant amount of grant funding during the relevant time period. Notwithstanding Dr. Mullenix' ability to generate grant funding as a principal investigator, she was paid less than Ahern and/or Dr. DiBart who were not responsible for generating external grant funding. More-over, a reasonable jury could conclude that Dr. Mullenix' background and experience exceeded the background and experience of Dr. Li and Ahern.

Forsyth therefore fails to establish as a matter of law that a factor other than sex, such as grant funding, experience and background and/or more significant contributions to the institution, justified the salary differential.

### Title VII (Counts I and III)

Forsyth also moves for summary judgment on the Title VII unequal pay claim. Forsyth argues that Dr. Mullenix cannot show that she was paid less than a man because she was a woman. (Docket Entry # 93. p. 12).[40] Prior to addressing the issue of discriminatory intent, this court turns to the issue of the effect of the incorporation of the defenses listed in the EPA into a Title VII sex based wage discrimination claim.

In a typical Title VII case alleging disparate treatment and absent the existence of direct evidence of intentional discrimination, "the plaintiff must attempt to prove her case by resort to a burden-shifting framework." *Smith v. F.W. Morse & Company,* 76 F.3d 413, 421 (1st Cir.1996) (citing *McDonnell Douglas Corporation v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824–25, 36 L.Ed.2d 668 (1973)). Under the burden

---

**40.** Forsyth argues that the Title VII unequal pay claims fail because there is no evidence that Forsyth paid Dr. Mullenix "less than a man *because* she was a woman (Title VII)." (Docket Entry # 92, pp. 1–2; Docket Entry # 93, p. 12). Forsyth does not provide much, if any, discussion in its papers to support the factual basis for this argument. Rather, Forsyth generally sets forth the *McDonnell Douglas* burden shifting framework without noting the particular criteria for a *prima facie* case or articulating the legitimate reasons for its alleged discrimination in denying equal pay to Dr. Mullenix. (Docket Entry # 93, pp. 10–12); *see* LR. 56.1. This court therefore construes this argument as asserting that Dr. Mullenix fails to meet her overall burden of showing that she was treated differently because of her gender, i.e., that Forsyth intentionally discriminated against Dr. Mullenix in denying her equal pay. Accordingly, this court will assume *arguendo* that Dr. Mullenix makes a *prima facie* showing and that Forsyth articulates legitimate reason[s] for its alleged discriminatory conduct. Indeed, Dr. Mullenix concedes for purposes of the summary judgment motion, that Forsyth's reason for paying her less than other male staff associates was due to insufficient funding. (Docket Entry # 102, p. 15). In the alternative, Dr. Mullenix adequately sets forth a *prima facie* showing as explained in the next footnote.

In addition, Forsyth claims that, because the Bennett Amendment incorporates the EPA affirmative defenses into a Title VII claim, Forsyth can invoke an EPA affirmative defense after Dr. Mullenix proves discriminatory animus and thereby defeat the Title VII unequal pay claim. (Docket Entry # 93, pp. 11–12). Because there is a split in the circuits with respect to the effect of the incorporation of the EPA's listed defenses into a Title VII unequal pay claim and because it is more than likely that this issue will be addressed at trial in the form of a jury charge, this court will also address Forsyth's contention that Title VII incorporates the EPA's affirmative defenses in the aforementioned manner.

shifting framework articulated in *McDonnell Douglas* and its progeny, the plaintiff must first set forth a *prima facie* case of discrimination.[41] Once the plaintiff establishes a *prima facie* case, "the burden of production, not persuasion, shifts to the defendant to articulate a plausible, legitimate and nondiscriminatory justification for the employment decision." *Hazel v. U.S. Postmaster General*, 7 F.3d 1, 3 (1st Cir.1993). In the event the

defendant succeeds in clearing "this modest hurdle, the presumption of discrimination vaporizes and the plaintiff . . . must then prove that the employer's proffered justification is a pretext for discrimination." *Smith v. F.W. Morse & Company*, 76 F.3d at 421; *see also Smith v. Stratus Computer, Inc.*, 40 F.3d 11, 16 (1st Cir.1994) (once the defendant articulates a legitimate reason, the burden shifts to

**41.** The elements of a *prima facie* case are not confined to an inflexible formula, but vary on a case by case basis depending on the underlying factual situation. *Elam v. C & P Telephone Company*, 609 F.Supp. 938, 947 (D.C.D.C.1984) (citing *McDonnell Douglas*, 411 U.S. at 802 n. 13, 93 S.Ct. at 1824 n. 13). Although lacking explicit guidance from the First Circuit with respect to the *prima facie* elements applicable to a Title VII sex based wage discrimination claim, the First Circuit in *Marcoux v. State of Maine*, 797 F.2d 1100, 1106 (1st Cir.1986), accepted the district court's use of an EPA analysis but noted that the defendants did not object to the use of this criteria. *Marcoux v. State of Maine*, 797 F.2d at 1106. A number of circuit and district court cases similarly require the plaintiff to show "that she is female and that the job she occupied was similar to higher paying jobs occupied by males" in order to set forth a *prima facie* case of sex based wage discrimination under Title VII. *Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1529 (11th Cir.1992); *see, e.g, Reece v. Martin Marietta Technologies, Inc.*, 914 F.Supp. 1236, 1240 n. 5 (D.Md.1995) (*prima facie* case of wage based sex discrimination under Title VII requires demonstrating that the plaintiff "is female, and that the job she occupied was similar to higher paying jobs occupied by males"); *Equal Employment Opportunity Commission v. Grinnell Corporation*, 881 F.Supp. at 413 (to set forth *prima facie* case, the plaintiff "must demonstrate that she is female, i.e., a member of a protected class, and that the job she occupies is similar to higher paying jobs occupied by males"); *Blount v. Alabama Cooperative Extension Service*, 869 F.Supp. 1543, 1550 (M.D.Ala. 1994) (to demonstrate *prima facie* case of Title VII salary claim, the plaintiff must show that: (1) she is female; (2) she occupies a position similar to male employees who are compensated at a higher rate than the plaintiff; *Cherrey v. Thompson Steel Company, Inc.*, 805 F.Supp. 1257, 1262 (D.Md.1992) (*prima facie* case under Title VII, as well as under EPA, requires proof that "employer paid different wages to employee of opposite sex for equal work"); but see *McMillan v. Massachusetts Society for the Prevention of Cruelty to Animals*, 880 F.Supp. 900, 905 (D.Mass.1995) setting forth traditional gender based *prima facie* elements as applicable to a plaintiff alleging Title VII wage discrimination).

Under this approach, Dr. Mullenix sufficiently sets forth a *prima facie* case of sex based wage

discrimination. Unquestionably, she is a female. For reasons explained in the EPA section, Dr. Mullenix also showed that her position as a full time staff associate was similar to the positions of other Forsyth male staff associates and that Forsyth paid these male associates a higher salary.

Although Forsyth does not address the particular criteria required to make a *prima facie* showing in a Title VII sex based wage discrimination claim or the application of such criteria to Dr. Mullenix' claim in its summary judgment motion, Dr. Mullenix briefly contends that a different set of criteria apply. Specifically, Dr. Mullenix contends that she established that she is a member of a protected class, that she met Forsyth's legitimate expectations, that she experienced an adverse employment action and that she was treated less favorably than her male counterparts. Dr. Mullenix' citation to *Smith v. Stratus Computer, Inc.*, 40 F.3d 11, 15 (1st Cir. 1994), *cert. denied*, 514 U.S. 1108, 115 S.Ct. 1958, 131 L.Ed.2d 850 (1995), and *Thompson v. Sawyer*, 678 F.2d 257 (D.C.Cir.1982), as setting forth this criteria for a Title VII sex based wage discrimination claim, however, is misplaced. First, *Smith v. Stratus Computer, Inc.*, 40 F.3d at 15, is a sex discrimination case which is not grounded on Title VII allegations of unequal pay provided to male coworkers. Second, although *Thompson v. Sawyer*, 678 F.2d 257 (D.C.Cir. 1982), included claims for violating the EPA and Title VII, the Title VII claim revolved around "the denial of access to training, craft, and supervisory positions." *Thompson v. Sawyer*, 678 F.2d at 266. Although the aforementioned case in this district cited as contrary authority in the preceding paragraph, *McMillan v. Massachusetts Society for the Prevention of Cruelty to Animals*, 880 F.Supp. at 905, supports Dr. Mullenix' view of the necessary elements of a *prima facie* showing of Title VII sex based wage discrimination, the case is contrary to the weight of authority. It is also more logical to specifically tailor the *prima facie* showing to a framework which involves the issue of higher paying jobs for similar work and thereby raises the inference of intentional discrimination in pay due to gender. Requiring a showing of similarity of positions also avoids importing issues of comparable worth into Title VII. *See Loyd v. Phillips Brothers, Inc.*, 25 F.3d 518, 525 (7th Cir.1994) (cautioning that " 'com-

the plaintiff who must then introduce sufficient evidence that the articulated reason is pretextual and "that the true reason is discriminatory"). The ultimate burden of persuasion on the issue of discriminatory intent remains at all times with the plaintiff. *Hazel v. U.S. Postmaster General*, 7 F.3d at 3.

Unlike Title VII, however, the EPA imposes a form of strict liability because discriminatory intent is not an element of liability. *Churchill v. International Business Machines, Inc.*, 759 F.Supp. 1089, 1096–1097 (D.N.J.1991). The specific methodology of establishing a violation of the EPA as described *supra* need not be repeated except to note that it differs from the aforementioned Title VII framework. Although the same facts may create causes of action under both statutes, Title VII and the EPA "have different purposes, coverage and procedures." *EEOC v. Sears, Roebuck & Company*, 628 F.Supp. 1264, 1331 (N.D.Ill.1986), *aff'd*, 839 F.2d 302 (7th Cir.1988).[42]

The Bennett Amendment to Title VII, however, incorporated the affirmative defenses of the EPA into Title VII.[43] The amendment states, in pertinent part, that:

> It shall not be an unlawful employment practice under this subchapter [Title VII] for any employer to differentiate upon the basis of sex in determining the amount of the wages or compensation paid or to be paid to employees of such employer if such differentiation is *authorized* [emphasis added] by the provisions of [the EPA].

42 U.S.C. § 2000e–2(h). Courts have disagreed about the degree to which the Bennett Amendment obviates the traditional burden shifting framework applicable to the majority of Title VII disparate treatment cases.

In *County of Washington v. Gunther*, 452 U.S. 161, 101 S.Ct. 2242, 68 L.Ed.2d 751 (1981), the Court addressed the interplay between the Bennett Amendment, Title VII and the EPA. In so doing, the Court noted that "the language of the Bennett Amendment suggests an intention to incorporate only the affirmative defenses of the [EPA] into Title VII" and concluded that only wage "differentials attributable to the four affirmative defenses of the [EPA] are 'authorized' by [the EPA] within the meaning of [the Bennett Amendment]." *County of Washington v. Gunther*, 452 U.S. at 168 & 171, 101 S.Ct. at 2247, 2249; *see also EEOC v. Sears, Roebuck & Company*, 628 F.Supp. at 1329 (the Court in *Gunther* "held that the Bennett Amendment incorporates into Title VII only the four affirmative defenses of the [EPA]"). The Court in *Gunther*, however, explicitly and repeatedly cautioned that it was not deciding "how sex-based wage discrimination litigation under Title VII should be structured" to accommodate the affirmative defenses and in particular the fourth affirmative defense. *County of Washington v. Gunther*, 452 U.S. at 168, 101 S.Ct. at 2247.[44]

After *Gunther*, courts differ in their allocation of burdens in a Title VII sex based wage discrimination case and, in particular, whether to incorporate the four defenses listed in the EPA as affirmative defenses into Title VII wherein the employer bears the burden of proof or, stated otherwise, whether a finding of liability under the EPA will automatically establish a finding of liability under

---

parable worth' is not a theory of liability under Title VII").

**42.** For instance, the EPA, "unlike Title VII, does not require exhaustion of administrative remedies." *Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1527 (11th Cir.1992). The EPA also "has a more generous statute of limitations for backpay relief." *EEOC v. Sears, Roebuck & Company*, 628 F.Supp. at 1332 n. 93.

**43.** It is generally the fourth affirmative defense, i.e., any other factor other than sex, which generates the greatest controversy with respect to incorporating the EPA defenses into Title VII. Title VII already recognizes the legitimacy of the first three affirmative defenses elsewhere in section

703(h) of the statute, 42 U.S.C. § 2000e–2(h). *EEOC v. Sears, Roebuck & Company*, 628 F.Supp. at 1331; *see also County of Washington v. Gunther*, 452 U.S. 161, 170 n. 10, 101 S.Ct. 2242, 2248 n. 10, 68 L.Ed.2d 751 (1981).

**44.** Elsewhere, the Court reiterated that: (1) "We are not called upon in this case to decide whether respondents have stated a *prima facie* case of sex discrimination under Title VII or to lay down standards for the further conduct of this litigation," *County of Washington v. Gunther*, 452 U.S. at 170 n. 11, 101 S.Ct. at 2248 n. 11 (citation omitted); and (2) "We do not decide in this case the precise contours of lawsuits challenging sex discrimination in compensation under Title VII," *County of Washington v. Gunther*, 452 U.S. at 181, 101 S.Ct. at 2254.

Title VII. The sixth, eighth and ninth circuits follow the line of authority that liability under the EPA establishes liability under Title VII with respect to sex based wage discrimination claims. *Fallon v. State of Illinois,* 882 F.2d 1206, 1213–1214 (7th Cir.1989) (collecting cases which automatically find Title VII liability with the finding of EPA liability in the sixth, eighth and ninth circuits); [45] *see also Meeks v. Computer Associates International,* 15 F.3d 1013, 1020 (11th Cir.1994) (similarly collecting cases from sixth, eighth and ninth circuits following this reasoning). The fourth, fifth, seventh, tenth and eleventh circuits, however, disagree with applying the EPA burdens to a Title VII sex based wage discrimination case, "choosing instead to analyze each claim independently." *Fallon v. State of Illinois,* 882 F.2d at 1214 (collecting cases from fifth and seventh circuits); *Churchill · v. International Business Machines, Incorporated,* 759 F.Supp. 1089, 1096 (D.N.J.1991) (collecting cases from fourth, fifth and seventh circuits); *Stephens v. L.C.H. Communications, Inc.,* 1994 WL 669686 at * 7 n. 11 (W.D.Mich. Oct.27, 1994) (collecting cases from tenth and eleventh circuits).

In the First Circuit, however, the issue is one of first impression. Decisions in the lower district court are not in uniform agreement. *Cf. Seligson v. Massachusetts Institute of Technology,* 677 F.Supp. 648, 654 n. 2 (D.Mass.1987) (agreeing with *EEOC v. Sears, Roebuck & Company,* 628 F.Supp. at 1328–1332, and finding that "the traditional Title VII allocation is appropriate"); *Denny v. Westfield State College,* 669 F.Supp. 1146, 1155 (D.Mass.1987) (concluding that Ninth Circuit view expressed in *Kouba v. Allstate Insurance Company,* 691 F.2d 873 (9th Cir. 1982) "represent[s] the better view"); *see*

also *McMillan v. Massachusetts Society for the Prevention of Cruelty to Animals,* 880 F.Supp. 900, 907 n. 4 (D.Mass.1995). In declining to decide the issue, however, the First Circuit in *Marcoux v. State of Maine,* 797 F.2d 1100, 1105 (1st Cir.1986), indicated that it would not follow the Ninth Circuit analysis employed in *Kouba.*[46] First, the court noted that, "*Kouba* has been severely criticized by the United States District Court for the Northern District of Illinois in *EEOC v. Sears, Roebuck & Company,* 628 F.Supp. 1264, 1328–32 (N.D.Ill.1986)."[47] *Marcoux v. State of Maine,* 797 F.2d at 1105. Second, the court repeated that "the *Kouba* analysis raises questions." *Marcoux v. State of Maine,* 797 F.2d at 1105. Third, in finding that the unobjected to use of the analysis in *Kouba* was not plain error, the court emphasized that, "In so doing, we make it clear that we do not mean to pass generally on the correctness of that mode of analysis." *Marcoux v. State of Maine,* 797 F.2d at 1106.

■■■■ This court therefore reads *Marcoux* as intimating that if directly faced with the issue of what burdens to allocate to a Title VII plaintiff in a sex based wage discrimination case, the First Circuit would follow the traditional burden shifting framework used in *McDonnell Douglas* absent direct evidence of discriminatory animus. Furthermore, it is well established that in Title VII cases the plaintiff carries the burden of proof that the defendant intentionally discriminated against the plaintiff at all times. Altering this well established burden of proof in a Title VII case by importing the defenses listed in the EPA into a Title VII claim as affirmative defenses in which the employer bears the burden of proof which can then operate to defeat a plaintiff's showing of intentional dis-

45. The court in *Fallon* additionally noted that the Tenth Circuit followed the above line of reasoning. The Tenth Circuit, however, issued· a decision after the *Fallon* decision wherein it followed the *McDonnell Douglas* approach even in Title VII sex based wage discrimination cases. *See Miranda v. B & B Cash Grocery Store, Inc.,* 975 F.2d 1518, 1528 (11th Cir.1992).

46. As explained in *Marcoux,* the Ninth Circuit in Kouba held that "the four defenses listed in [the EPA] and incorporated into Title VII through the Bennett Amendment are affirmative defenses on

which the ·employer has the burden of proof." *Marcoux v. State of Maine,* 797 F.2d at 1105.

47. Moreover, it is not often that the First Circuit cites an Illinois district court opinion nor uses such an opinion to illustrate criticism of a circuit court decision. In addition, the court in *Marcoux* addressed in depth an issue which could have been decided in a more abbreviated manner on the basis of the absence of plain error given the supporting legal authority for the lower court's position.

crimination would constitute a substantial change derived from the vague language of the Bennett Amendment. *See Tidwell v. Fort Howard Corporation,* 989 F.2d 406, 411 (10th Cir.1993). Finally, " 'It would [also] be odd to say the least if the evidentiary rules applicable to Title VII actions were themselves dependent on the gender or skin color of the litigants.' " *Tidwell v. Fort Howard Corporation,* 989 F.2d at 411 (quoting Justice O'Connor concurring in *Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989)). Accordingly, the burden shifting framework of *McDonnell Douglas* applies to Dr. Mullenix' Title VII sex based claim of wage discrimination set forth in counts I and III.[48]

■ The issue therefore arises as to where an EPA defense fits in the *McDonnell Douglas* framework. Contrary to Forsyth's assertion,[49] however, it is inappropriate to characterize the defenses listed in the EPA as affirmative defenses and to allow the defendant to invoke such defenses after a plaintiff proves discriminatory animus. Taking Forsyth's argument to its logical conclusion, a defendant could avoid Title VII liability notwithstanding the plaintiff's proof that the defendant had engaged in intentional discrimination. Title VII expressly states that, "It shall be an unlawful employment practice for an employer (1) ... to discriminate against any individual with respect to [her] compensation ... because of such individual's ... sex." 42 U.S.C. § 2000e–2(a).

■ In addition, although the first sentence of section 703(h) of Title VII declares that bona fide seniority and merit systems as well as systems measuring compensation by quantity or quality [50] "shall not be an unlawful employment practice," the section only allows an employer to compensate employees differently "provided that such differences are not the result of an intention to discriminate because of ... sex."

42 U.S.C. § 2000e–2(h) (first sentence). Case law does not construe this language as setting forth an affirmative defense. Instead, section 703(h) simply allows the operation of a seniority or merit system notwithstanding that it has discriminatory effects. Stated otherwise, an employee cannot use a disparate impact theory to invalidate a seniority or merit system or a system which measures compensation by quantity or quality. *See Hiatt v. Union Pacific Railroad Company,* 65 F.3d 838, 842 (10th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 917, 133 L.Ed.2d 847 (1996) ("challenges to the effects of bona fide seniority systems may not be based upon assertions of disparate impact; rather a plaintiff must prove intentional discrimination"); *accord Banas v. American Airlines,* 969 F.2d 477, 481 n. 5 (7th Cir.1992) (because of section 703(h) "disparate impact cannot be used to invalidate a seniority system; intentional discrimination must be shown"). Because the Bennett Amendment was "a 'technical amendment' designed to resolve any potential conflicts between Title VII and the [EPA]," *County of Washington v. Gunther,* 452 U.S. at 170, 101 S.Ct. at 2248, the likely impact of the EPA's fourth defense is limited to allowing a Title VII employer to assert "as a legitimate and non-discriminatory reason a reason which happens also to cause a disparate impact." *Fallon v. State of Illinois,* 882 F.2d at 1215.

■ Finally, it is not necessarily inconsistent for a plaintiff to recover on an EPA claim due to the defendant's failure to establish an affirmative defense and for the plaintiff not to recover on a Title VII claim. *See Brinkley–Obu v. Hughes Training, Inc.,* 36 F.3d 336, 344 n. 17 (4th Cir.1994); *Brewster v. Barnes,* 788 F.2d 985, 991–993 (4th Cir. 1986); *see also Fallon v. State of Illinois,* 882 F.2d at 1217.

---

**48.** For reasons stated in *Fallon,* section 1620.27 of the EEOC regulations, 29 C.F.R. § 1620.27, does not alter this court's decision. *See Fallon v. State of Illinois,* 882 F.2d at 1217–1218.

**49.** As previously noted, Forsyth contends that after the plaintiff makes a showing in satisfaction of *McDonnell Douglas* and proves discriminatory

animus, the burden of persuasion shifts to the defendant who may invoke the affirmative defenses. (Docket Entry # 93, p. 11).

**50.** As previously noted, seniority, merit and/or quantity or quality of production comprise the first three defenses listed in the EPA.

Thus, in lieu of treating the defenses listed in the EPA as affirmative defenses to be proven after a showing of discriminatory intent, the more logical approach is either to treat the defenses listed in the EPA as part of the defendant's burden of production in refuting the plaintiff's *prima facie* case or in the same manner as the three defenses listed in section 703(h) of Title VII. It is not necessary to decide this issue, however, in order to resolve Forsyth's summary judgment motion because of the previously discussed genuine issues of material fact surrounding the EPA defenses. The structuring of the burdens of proof in the Title VII sex based wage discrimination claim, while suggested by this court therefore need not be resolved definitively at this time and accordingly lies wholly within the province and the discretion of the district judge.

Turning to the issue of discriminatory animus, Forsyth explains that the differential in Dr. Mullenix' salary[51] results from her inability to obtain external grant funding and to contribute to the institution. Forsyth also maintains that Dr. Mullenix inappropriately compares her compensation to the compensation of tenured employees. (Docket Entry # 110, p. 7; Docket Entry # 93, pp. 15–16). Dr. Mullenix submits that these reasons are pretextual and that Forsyth's true reason was discriminatory.

Contrary to Forsyth's position, Dr. Mullenix sufficiently points to facts raising an inference that Forsyth's reasons were pretextual and that discriminatory animus was the real reason for the differentials in compensation. Viewing the record in Dr. Mullenix' favor, Forsyth compensated a number of male staff associates at a time when they did not receive external funding. In particular, Ahern and/or Dr. DiBart, two male staff associates, were not responsible for generating external funding yet Forsyth provided them compensation. In 1994 For-

syth had suspended Dr. Mullenix' salary payments but it nevertheless paid Ahern $35,895 in 1994 and Dr. DiBart $30,479 in 1994 (Docket Entry # 101, Ex. L). Furthermore, from 1990 to 1993 Dr. Mullenix only received $100,924 in compensation while generating an estimated $684,331 in external, governmental funding.[52] (Docket Entry # 97, Ex. 9). Again viewing the record in Dr. Mullenix' favor including reasonable inferences therefrom, Forsyth compensated Dr. Li at a higher salary during this time period notwithstanding his failure to generate external funding. According to Dr. Mullenix' expert, Forsyth compensated other male staff associates at a higher rate than it compensated Dr. Mullenix. Moreover, as a principal investigator, Dr. Mullenix' work was no less difficult than, for example, the work of Ahern. Dr. Mullenix asseverates that no one at Forsyth ever questioned the quality of her work or that her fluoride research did not lie within Forsyth's mission. (Docket Entry # 102, Mullenix Affidavit).[53] As explained in the background section, Dr. Mullenix' expert provides additional evidence of the pretextual nature of Forsyth's explanations for Dr. Mullenix' lower salary and Forsyth's suspension of her salary when she did not receive external funding.

Dr. Mullenix thereby shows that the stated reasons, lack of external funding and failure to contribute to Forsyth's mission, are unworthy of credence. "A showing that the employer's stated reason was not used to reject persons outside the protected group is one way to show pretext." *Cole v. Ruidoso Municipal Schools,* 43 F.3d 1373, 1381 n. 6 (10th Cir.1994); *see also Gibson v. American Library Association,* 846 F.Supp. 1330, 1337–1338 (N.D.Ill.1993) (evidence that white female was allowed salary increase whereas the plaintiff, a black female, did not receive salary adjustment supported finding of race

---

51. Forsyth, of course, denies paying Dr. Mullenix less than male staff associates performing similar work.

52. It is reasonable to assume that Dr. Mullenix did not receive this entire salary during the relevant year of 1993.

53. Dr. Mullenix' averment conflicts with a notation in Dr. Gibbons' March 30, 1993 letter to Dr. Mullenix that senior staff members "are concerned that your research, though of merit, does not generally fall within the major missions of the Institution." Notwithstanding this evidence, this court is obligated to view the record in Dr. Mullenix' favor.

discrimination sufficient to deny employer summary judgment on this claim).

In addition, although the issue is close and does not weigh in Dr. Mullenix' favor,[54] she also points to sufficient evidence to enable a jury to find that the alleged reasons, i.e., the lack of external funding and the failure to support Forsyth's mission, were not only pretextual but were also motivated by gender discrimination. The strength of Dr. Mullenix' credentials particularly in comparison to Ahern's credentials, her status as a principal investigator, her ability to generate NIH funding in significant amounts shortly before the suspension of her salary, and the absence of external funding generated by male staff associates in similar positions all contribute to raise a strong enough inference for the factfinder to find actual discrimination. In addition to other evidence in the record, Dr. DenBesten, a former staff associate at Forsyth in the Department of Biochemistry, also stated that Forsyth was an institution "built in a time gone by, when guys got together and ran their labs" and where "men felt more comfortable with men." Although "there wasn't active maliciousness," according to Dr. DenBesten, men were more easily accepted at Forsyth particularly if they "went out and did things" such as play basketball. (Docket Entry # 98, DenBesten Deposition).

▪ "[D]eterminations of motive and intent, particularly in discrimination cases, are questions better suited for the jury, 'as proof is generally based on inferences that must be drawn, rather than on the proverbial "smoking gun." ' " *Petitti v. New England Telephone and Telegraph Company,* 909 F.2d 28, 34 (1st Cir.1990). Notwithstanding contrary evidence, including, the more tangential nature of Dr. Mullenix' research to Forsyth's overall mission and the more relevant contributions and research of certain other male staff associates such as Dr. DiBart and Dr. Ganeshkumar, the record contains enough

evidence for a factfinder to infer discriminatory animus on the basis of gender.

#### 4. *MEPA Claim (Count IV)*

Forsyth also moves for summary judgment on the MEPA claim, Count IV. Notwithstanding that Forsyth's only reference to the MEPA in its supporting memorandum appears in a footnote (Docket Entry # 93, p. 6), this court will address the alleged absence of evidence of Forsyth's liability under the MEPA. Because Forsyth argues that Dr. Mullenix' position was not substantially equal to the jobs of other staff associates in the context of its EPA argument, this court will also use this argument, albeit tailored to the language of the MEPA, to evaluate Forsyth's entitlement to summary judgment under the MEPA.

▪ The MEPA states, in pertinent part, that:

No employer shall discriminate in any way in the payment of wages as between sexes, or pay any person in his employ salary or wage rates less than the rates paid to employees of the opposite sex for work of like or comparable character or work on like or comparable operations; provided, however, that variations in rates of pay shall not be prohibited when based upon a difference in seniority.

Mass.Gen.L. ch. 149, § 105A. Although the MEPA, like the EPA, encompasses a cause of action for unequal pay, the two statutes employ different definitions of equal or comparable work and allow an employer to use different defenses to justify a wage differential.

▪ Turning to the definition of comparable work, the term "comparable" under the MEPA is more inclusive than the term "equal" under the EPA. *Jancey v. School Committee of Everett,* 421 Mass. 482, 658 N.E.2d 162, 167 (1995). Applying the comparable work standard of the MEPA "requires a two-part analysis." *Jancey v. School Com-*

---

54. This court, however, cannot assess credibility and weigh conflicting evidence on a summary judgment motion. "Strong evidence is not necessarily uncontradicted evidence; and at the summary judgment stage, the district judge cannot 'superimpose his own ideas of probability

and likelihood (no matter how reasonable those ideas may be) upon the facts of record.' " *Medina–Munoz v. R.J. Reynolds Tobacco Company,* 896 F.2d 5, 9 n. 3 (1st Cir.1990) (affirming summary judgment in Title VII case).

*mittee of Everett,* 658 N.E.2d at 167. First, there must be a determination of "whether the substantive content of the jobs is comparable, that is, whether the duties of the jobs have 'important common characteristics.'" *Jancey v. School Committee of Everett,* 658 N.E.2d at 167. Two positions which "are so dissimilar in their substantive content that a reasonable person would regard them as categorically separate are not 'comparable.'" *Jancey v. School Committee of Everett,* 658 N.E.2d at 168.

Second, in the event the jobs have a comparable substantive content, the second inquiry becomes "appropriate—whether the two positions entail comparable skill, effort, responsibility, and working conditions." *Jancey v. School Committee of Everett,* 658 N.E.2d at 168. Like the EPA, liability under the MEPA does not require a finding of intentional discrimination on the basis of sex. *Jancey v. School Committee of Everett,* 658 N.E.2d at 170.

Turning to the substantive content of Dr. Mullenix' position vis-a-vis other staff associates, there are material issues of fact as to whether these jobs have common important characteristics. From one perspective, full time staff associate positions at Forsyth, including Dr. Mullenix' position, have the common and important characteristics of engaging in research and making scientific contributions to the overall area of oral health. From another perspective, in contrast to the substantive content of Dr. Mullenix' position, the substantive content of a number of full time staff associate positions at Forsyth did not require external funding. Dr. Hay attests to the differences in substantive content. (Docket Entry # 101, Ex. L). For example, the substantive content of Ahern's position did not require him to generate grant funding to support his salary. (Docket Entry # 101, Ex. L).

Genuine issues of material fact also exist with regard to whether Dr. Mullenix' position and the positions of other full time male staff associates involve comparable skill, effort, responsibility and working conditions. From one vantage point, the positions concerned the comparable working environment of a research laboratory with the common respon-

sibility of working on grant awards. From another vantage point, the positions involved different areas of research at different levels of effort.

In sum, viewing the record in Dr. Mullenix' favor, it is for the finder of fact, first, to determine the comparability of the substantive content of the jobs and, second, to determine whether the two positions entail comparable skill, effort, responsibility and working conditions.

### 5. *Retaliation (Count I)*

Forsyth also seeks summary judgment with respect to the allegations in Count I that Forsyth retaliated against Dr. Mullenix in violation of Title VII.

Section 2000e–3(a) of Title 42 of the United States Code prescribes retaliation against employees for opposing unlawful employment practices or for filing EEOC charges or participating in an investigation. 42 U.S.C. § 2000e–3(a). Because Title VII protects an employee against sexual harassment and discrimination, Title VII also protects the employee for opposing such activities. *See Ruffino v. State Street Bank and Trust Company,* 908 F.Supp. 1019, 1044 (D.Mass.1995).

The plaintiff's burden to establish a *prima facie* case of retaliation "'is not onerous.'" *Hazel v. U.S. Postmaster General,* 7 F.3d 1, 3 (1st Cir.1993). A plaintiff sets forth a *prima facie* case which thereby creates an inference of retaliatory motive by demonstrating that: "(1) she engaged in protected conduct under Title VII ...; (2) she suffered an adverse employment action; and (3) a causal connection existed between the protected conduct and the adverse action." *Fennell v. First Step Designs, Limited,* 83 F.3d 526, 535 (1st Cir.1996); *accord Eldred v. Consolidated Freightways Corporation of Delaware,* 898 F.Supp. 928, 930 (D.Mass. 1995) (setting forth same elements).

Once the plaintiff makes a *prima facie* showing, the defendant has the burden of production, not persuasion, to articulate a plausible, legitimate, nondiscriminatory justification for its employment decision. *Fennell*

*v. First Step Designs, Limited*, 83 F.3d at 535; *Hazel v. U.S.Postmaster General*, 7 F.3d at 3. If successful, the *McDonnell Douglas* framework is no longer relevant and the issue becomes whether the defendant acted with retaliatory animus. *Hazel v. U.S.Postmaster General*, 7 F.3d at 3; *Mesnick v. General Electric Co.*, 950 F.2d 816, 827 (1st Cir.1991), *cert. denied*, 504 U.S. 985, 112 S.Ct. 2965, 119 L.Ed.2d 586 (1992). In order to survive summary judgment, the plaintiff must then demonstrate that the proffered reason was "in fact a pretext and that the job action was the result of the defendant's retaliatory animus." *Fennell v. First Step Designs, Limited*, 83 F.3d at 535 (similarly noting that employee needed to show that employer's "business reasons were a pretext and" that "her discharge was in retaliation for her reports of sexual harassment"). The "issue of retaliatory motive in an employment discrimination case presents 'a pure question of fact.'" *Hazel v. U.S. Postmaster General*, 7 F.3d at 4; *Ruffino v. State Street Bank and Trust Company*, 908 F.Supp. at 1045.

In the case at bar, Dr. Mullenix asserts that the protected activity begins with the April 28, 1993 letter from Dr. Mullenix' attorney to Dr. Gibbons. She also characterizes the September 3, 1993 filing of a charge of discrimination with the MCAD, the filing of her EEOC charge and the March 1994 filing of this lawsuit as protected activities. (Docket Entry #102; Docket Entry #59, ¶55).

■■■ Protected activity under the first element of a *prima facie* case extends beyond the filing of a formal complaint with the EEOC. *Coleman v. Wayne State University*, 664 F.Supp. 1082, 1092 n. 5 (E.D.Mich.1987); *see, e.g., Fennell v. First Step Designs, Limited*, 83 F.3d at 536 (report to employer of sexual harassment constituted the protected activity); *Eldred v. Consolidated Freightways Corporation of Delaware*, 898 F.Supp. 928, 940 (D.Mass.1995) (opposing pay disparity with manager constituted protected activity). Thus, contacting an attorney who then advises the employer of the employee's complaints of sex discrimination constitutes protected activity sufficient to satisfy the relatively light burden of setting forth a *prima*

*facie* case in order to withstand a summary judgment motion. See, *e.g., Harker v. Utica College of Syracuse University*, 885 F.Supp. 378, 385 (N.D.N.Y.1995) ("voicing complaints about discriminatory employment practices are sufficient to constitute protected activity"). Moreover, Dr. Gibbons knew of the protected activity upon receipt of the April 28, 1993 letter. It is also without question that filing a complaint with the MCAD and the EEOC as well as filing a discrimination lawsuit comprise protected activity. *See, e.g., Cole v. Ruidoso Municipal Schools*, 43 F.3d 1373, 1381 (10th Cir.1994) (filing EEOC complaint satisfies first element of *prima facie* retaliation claim); *Lynch v. General Motors Corporation*, 1994 WL 129573 at *12 (D.Mass. Feb.18, 1994) (employee engaged in protected activity by filing charges with MCAD).

■■■ With respect to the second element of a *prima facie* case, Dr. Mullenix defines the adverse job action as including the 1994 refusal to reappoint her to a staff associate position. (Docket Entry #102; Docket Entry #59, ¶56(d)). Forsyth eventually terminated her employment on June 30, 1994. (Docket Entry #107, Mullenix Affidavit, ¶12). Such events constitute adverse employment action.

■■■ As stated above, the third element in a *prima facie* case requires the plaintiff to demonstrate a causal connection. Ordinarily, a long span of time between the protected activity and the adverse action may negate the inference of a causal connection. *See Ruffino v. State Street Bank and Trust Company*, 908 F.Supp. 1019, 1044–1045 (D.Mass. 1995); *see, e.g., Mesnick v. General Electric Company*, 950 F.2d 816, 828 (1st Cir.1991), *cert. denied*, 504 U.S. 985, 112 S.Ct. 2965, 119 L.Ed.2d 586 (1992) (characterizing nine months as "a long gestation period" and finding no causal connection). Conversely, a short span of time between the protected activity and the adverse action is "'strongly suggestive of retaliation.'" *Fennell v. First Step Designs, Limited*, 83 F.3d at 535–536 (quoting *Oliver v. Digital Equipment Corporation*, 846 F.2d 103, 110 (1st Cir.1988)).

■ Viewing the record in Dr. Mullenix' favor, shortly after filing this lawsuit in March 1994, senior staff members met in April 1994 and unanimously voted not to renew Dr. Mullenix' appointment. Dr. Gibbons waited until May 18, 1994, to advise Dr. Mullenix of the senior staff members' recommendation. On May 31, 1994, Dr. Gibbons informed Dr. Mullenix of the Board of Trustees' approval of the recommendation not to renew her appointment. Forsyth terminated her employment on June 30, 1994, well before the expiration of the six month notice provision applicable to Dr. Mullenix.[55] The close proximity in time is indirect proof of a causal connection and sufficiently establishes the third and final element of Dr. Mullenix' *prima facie* case. *See, e.g., Ramos v. Roche Products, Inc.*, 936 F.2d 43, 46 & 49 (1st Cir.), *cert. denied*, 502 U.S. 941, 112 S.Ct. 379, 116 L.Ed.2d 330 (1991) (retaliatory motive reasonably inferred where employer denied employee promotion in March 1983 and reduced employee's evaluation in June 1983 in light of employee being named as witness in discrimination lawsuit filed in January 1983).

As justifiable reasons for not renewing Dr. Mullenix' appointment, Forsyth points to the lack of external funding in the preceding year and the lack of an identifiable source of funding for the upcoming year. (Docket Entry # 93, pp. 19–20). The minutes to the March 1994 senior staff members' meeting set forth additional reasons. Assuming for purposes of argument that Forsyth satisfies its burden of production, Dr. Mullenix nevertheless sets forth sufficient evidence of retaliatory animus to survive summary judgment.

■ Circumstantial evidence of retaliation may include the differential treatment of the employee in the workplace, "statistical evidence showing disparate treatment, temporal proximity of an employee's protected activity to an employer's adverse actions[56] and comments by the employer which intimate a retaliatory mindset." *Mesnick v. General Electric Company*, 950 F.2d at 828 (citations omitted). At the April 19, 1994 senior staff members' meeting, the senior staff members considered whether to recommend the reappointment of ten other Forsyth employees in addition to Dr. Mullenix. With the exception of Dr. Mullenix, the senior staff members unanimously voted to recommend reappointment of all of the other Forsyth employees. Dr. Mullenix therefore experienced differential treatment in comparison to other staff associates who did not complain about discriminatory treatment or file charges with the EEOC.[57]

The statistical evidence propounded by Dr. Mullenix' expert (Docket Entry # 97, Ex. 9, Schedule 11), while disputed,[58] also supports an inference of retaliatory animus directed at Dr. Mullenix. The analysis of Dr. Mullenix' expert shows that Forsyth promoted four staff associates between 1991 and 1994 and terminated only two of 27 Forsyth employees, Drs. Mullenix and Snapp, between 1991 and 1994. Although not entirely clear, the record indicates that, with respect to Dr. Snapp, she may have voluntarily accepted another position inasmuch as the April 19, 1994 minutes of the senior staff members' meeting reflect that the senior staff members unanimously voted to reappoint Dr. Snapp after discussing her acceptance of another position in August. (Docket Entry # 97, Ex.

---

**55.** Construing the disputed facts in Dr. Mullenix' favor, the pre-April 1993 appointment procedures applied to Dr. Mullenix up to the time of her termination.

**56.** Cases relied on in *Mesnick* for the proximity in time factor involve satisfying the *prima facie* case as opposed to satisfying the ultimate burden of showing retaliatory animus in order to withstand summary judgment.

**57.** This court makes the reasonable inference that the other Forsyth employees did not file charges of discrimination with the EEOC or file lawsuits against Forsyth in 1993 and 1994.

**58.** Dr. Mullenix' expert disagrees with Forsyth's expert as to the number of promotions awarded to female staff associates in comparison to the number of promotions afforded to male staff associates. Dr. Mullenix' expert also uses a different time frame. He compares promotions during the time period of 1991 to 1994 (Docket Entry # 97, Ex. 9, Schedule 11) whereas Forsyth's expert compares the number of promotions beginning from the date of an employee's hiring to the date of a promotion, if any. (Docket Entry # 94, A–173 & A–174).

19). Further tailoring the time period and the positions at issue, in 1993 Forsyth promoted Dr. Li, a male staff associate, while in July 1994 Forsyth terminated Drs. Mullenix and Snapp, two female staff associates. Although these statistics involve a small statistical sample, Forsyth's work force was not large. Moreover, the statistics connect Forsyth's treatment of Dr. Mullenix to its treatment of employees in the same division of the company, in the same geographical area and, as favorably construed and tailored, with respect to the same positions. *Cf. LeBlanc v. Great American Insurance Company,* 6 F.3d 836, 848 (1st Cir.1993), *cert. denied,* 511 U.S. 1018, 114 S.Ct. 1398, 128 L.Ed.2d 72 (1994) (cautioning against use of statistics in disparate treatment cases).[59] In addition, as previously explained, Dr. Mullenix adequately refutes the legitimacy of Forsyth's reasons for the nonrenewal by demonstrating that Forsyth did not require a number of other staff associates to generate external funding in order to continue their employment. Dr. Mullenix' record of publications and generation of NIH funding in the years immediately preceding the nonrenewal of her appointment also support characterizing the reasons set forth in the minutes of the April 19, 1994 meeting as pretextual.

 Again, although this court views Dr. Mullenix' showing as weak, she nevertheless proffers sufficient evidence to create a jury question that Forsyth's reasons were pretex-

tual and that the nonrenewal and termination of her position were in retaliation for engaging in protected activity. Summary judgment is therefore inadvisable on the Title VII retaliation claim.[60]

#### 6. Hostile Work Environment (Count V)

In seeking summary judgment, Forsyth points to the absence of evidence to support Dr. Mullenix' hostile work environment claim under federal and state law. Forsyth contends that Dr. Mullenix must establish that Forsyth's conduct was intimidating to her as opposed to other women scientists at Forsyth. Forsyth additionally submits that the three comments listed in the amended complaint are neither sufficiently pervasive nor severe to merit relief.[61] (Docket Entry # 93)

Dr. Mullenix argues that Forsyth's conduct with respect to its female scientists constitutes relevant evidence to support her hostile work environment claim. Dr. Mullenix describes three incidents experienced by female co-workers which, she contends, were sexually offensive. She also sets forth three comments made by Forsyth employees to her which evidence discriminatory conduct. In addition, Dr. Mullenix complains about Forsyth's more deferential treatment of Dr. Niederman who Forsyth promoted notwithstanding his false accusation that Dr. Snapp plagiarized certain research. Finally, Dr. Mullenix submits that Forsyth's charter and by-laws do not prescribe discrimination on

**59.** The court in *LeBlanc* affirmed summary judgment in favor of the employer notwithstanding statistics propounded by the employee. The court discounted the proffered statistics because they: (1) failed to provide information on the age and qualifications of the pool of applicants; (2) failed to distinguish between voluntary and involuntary departures; and (3) only involved a small sample of the employer's dismissal of five employees in a two year period out of a total of 215 individuals. *LeBlanc v. Great American Insurance Company,* 6 F.3d at 848–849.

In the case at bar, Dr. Mullenix' expert supplies a comparison involving only a total of 27 Forsyth employees as opposed to the 215 at issue in *LeBlanc* The ratio is therefore larger although the number of terminated employees Is admittedly smaller. In addition, the statistics identify the positions of the employees. Finally, Forsyth's expert, who uses a time period from the hiring date to the promotion date and compares only scientists occupying the position of staff associate

at the time of the promotion, acknowledges that women waited approximately four years for a promotion while men waited only approximately three years for a promotion. Moreover, one of the women who Forsyth promoted in a relatively short period of time (2.8 years) is the woman who believed "it was much more difficult to become a part of the community as a woman" and who consequently "worked very hard to make sure people liked [her]." (Docket Entry # 98, DenBesten Deposition).

**60.** In reaching this conclusion, this court has not considered the notation "resent blackmail threat" appearing in Dr. Gibbons notes of the March 19, 1993 senior staff meeting. *See Fennell v. First Step Designs, Limited,* 83 F.3d at 536.

**61.** In a reply brief, Forsyth additionally argues that Dr. Mullenix never complained about the hostile work environment or contended that it effected her conditions of employment.

the basis of sex. Rather, they only prohibit discrimination on the basis of race, color or religion. (Docket Entry # 102).

"Sexual harassment under Title VII may be actionable as '*quid pro quo* harassment' and as 'hostile environment' discrimination." *Chamberlin v. 101 Realty, Inc.*, 915 F.2d 777, 782 (1st Cir.1990); *accord Tomka v. Seiler Corporation*, 66 F.3d 1295, 1304–1305 (2d Cir.1995) (two forms of sexual harassment violate Title VII, *quid pro quo* and hostile environment). Dr. Mullenix' claim falls into the latter category.

In order to rise to the level of an actionable Title VII violation under the hostile environment theory, the harassment must be "sufficiently severe or pervasive to alter the conditions of the victims's employment and create an abusive working environment." *Morgan v. Massachusetts General Hospital*, 901 F.2d 186, 192 (1st Cir.1990) (quoting *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 67, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49 (1986)); *accord Ruffino v. State Street Bank and Trust Company*, 908 F.Supp. 1019, 1036 (D.Mass.1995) (quoting same passage from *Meritor*); *see also Harris v. Forklift Systems, Inc.* 510 U.S. 17, 21, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993) (quoting *Meritor* and recognizing that Title VII is violated when the workplace is permeated with discriminatory ridicule that is "'sufficiently severe or pervasive to alter the conditions of the victims's employment and create an abusive working environment'").

The determination of whether a work environment is abusive or hostile "can be determined only by looking at all the circumstances." *Harris v. Forklift Systems,*

*Inc.*, 510 U.S. at 23, 114 S.Ct. at 371. The list of such circumstances, also identified as factors, *Scarfo v. Cabletron Systems, Inc.*, 54 F.3d 931, 945 (1st Cir.1995), "include[s] the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Systems, Inc.*, 510 U.S. at 23, 114 S.Ct. at 371. Conduct which seriously effects a reasonable person's psychological well being may also violate Title VII although Title VII is not limited to such conduct. *Harris v. Forklift Systems, Inc.*, 510 U.S. at 22–24, 114 S.Ct. at 371. "The effect on the employee's psychological well-being is" also "relevant to determining whether the plaintiff actually found the environment abusive." *Harris v. Forklift Systems, Inc.*, 510 U.S. at 23, 114 S.Ct. at 371.

A reasonable person must therefore find the work environment hostile or abusive.[62] Likewise, the victim must subjectively perceive the work environment as abusive. *Harris v. Forklift Systems, Inc.*, 510 U.S. at 20–22, 114 S.Ct. at 370.[63]

It is also true that an isolated sexual advance, without more, does not constitute an abusive environment under Title VII.[64] *Chamberlin v. 101 Realty, Inc.*, 915 F.2d at 783 (dicta). Thus, the mere utterance of an epithet does not implicate Title VII. *Harris v. Forklift Systems, Inc.*, 510 U.S. at 21, 114 S.Ct. at 370 (quoting *Meritor*); *see, e.g., Hopkins v. Baltimore Gas and Electric Compare*, 77 F.3d 745, 754 (4th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 70, 136 L.Ed.2d 30 (1996) (collecting cases where summary judgment affirmed

---

**62.** This court need not decide whether this objective standard is taken from the view of a reasonable man or woman in the plaintiff's position because from either viewpoint there is no objectively hostile or abusive work environment as a matter of law.

**63.** The complete passage from *Harris* reads as follows:

Conduct that is neither severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview. Likewise,

if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation.

*Harris v. Forklift Systems, Inc.*, 510 U.S. at 21–22, 114 S.Ct. at 370.

**64.** In comparison, under state law the SJC does not impose "a quantitative requirement on the incidents of harassment that will constitute actionable sex discrimination." *Gnerre v. Massachusetts Commission Against Discrimination*, 402 Mass. 502, 524 N.E.2d 84, 88 (1988).

due to lack of severe and pervasive environment).

In *Morgan*, the First Circuit set the parameters of sexually harassing conduct which would not survive an employer's summary judgment motion. *Morgan v. Massachusetts General Hospital*, 901 F.2d at 192–193. The male employee in *Morgan* complained of three incidents of sexual misconduct directed at him by an allegedly homosexual male co-worker. Specifically, Morgan detailed two physical incidents of harassing conduct and one incident where the co-worker " 'peeped' at [Morgan's] 'privates' " while standing next to him in the restroom. *Morgan v. Massachusetts General Hospital*, 901 F.2d at 193. The two physical incidents occurred during a one month period.[65] The first occurred at a Christmas party where "the co-worker asked [Morgan] to dance and started to 'pull on him.' " *Morgan v. Massachusetts General Hospital*, 901 F.2d at 188. The second incident happened when the co-worker stood behind Morgan "while he mopped, causing [Morgan] to bump into the co-worker." *Morgan v. Massachusetts General Hospital*, 901 F.2d at 193.

■■■ With respect to state law, chapter 151B of Massachusetts General Laws ("chapter 151B") prohibits work environments per-

vaded by harassment or abuse.[66] *College–Town v. Massachusetts Commission Against Discrimination*, 400 Mass. 156, 508 N.E.2d 587, 591 (1987); *accord Ramsdell v. Western Massachusetts Bus Lines*, 615 N.E.2d at 195. In assessing whether sexually harassing conduct violates chapter 151B, Massachusetts courts "may look to the interpretations of Title VII" but are not "bound by interpretations of the Federal statute in construing" chapter 151B. *College–Town v. Massachusetts Commission Against Discrimination*, 508 N.E.2d at 591. With respect to hostile work environment claims, chapter 151B explicitly prescribes sexual advances, requests or conduct which have the effect of "unreasonably interfering with" the victim's "work performance by creating an intimidating, hostile, humiliating or sexually offensive work environment." Mass.Gen.L. ch. 151B, §§ 4(1) & 1(18)(b).[67] As summarized by the SJC, " '[A] work environment pervaded by harassment or abuse, with the resulting intimidation, humiliation, and stigmatization, possess a formidable barrier to the full participation of an individual in the workplace.' " *Ramsdell v. Western Massachusetts Bus Lines*, 615 N.E.2d at 195 (quoting *College–Town v. Massachusetts Commission Against Discrimination*, 508 N.E.2d at 591).

**65.** The co-worker began working with. Morgan in early December 1984. The last incident occurred in late December 1984.

**66.** The amended complaint does not cite to any particular state statute. Rather, the amended complaint simply states that, "Forsyth's conduct violated both state and federal laws that prohibit creating or permitting such a hostile work environment towards women employees." (Docket Entry # 59, ¶ 79). In seeking summary judgment on the hostile work environment claim set forth in Count V, Forsyth cites to two Massachusetts cases which, in turn, cite to chapter 151B. In opposing summary judgment, Dr. Mullenix does not address Forsyth's liability for creating a hostile work environment under state law or, more particularly, its liability under chapter 151B. Left at somewhat of a loss, this court construes Dr. Mullenix' claim as a hostile work environment claim given the phraseology and title of Count V. Accordingly, the pertinent provision under state law is subsection 1(18)(b) of chapter 151B as opposed to subsection 1(18)(a) of chapter 151B. Subsection 1(18)(b) of chapter 151B expressly concerns the creation of a *"hostile ... work environment,"* whereas subsection

1(18)(a) speaks to submitting to sexual advances as "a term or condition of employment" and makes no mention of a hostile work environment. Mass.Gen.L. ch. 151B, § 1(18) (emphasis added); *see Ramsdell v. Western Massachusetts Bus Lines*, 615 N.E.2d at 195 (distinguishing between subsection 1(18)(a) and subsection 1(18)(b)).

**67.** Section 4(1) of chapter 151B makes it an unlawful practice for an employer to discriminate against an individual on the basis of sex. Mass.Gen.L. ch. 151B, § 4(1). Section 1(18) of chapter 151B states that, "Discrimination on the basis of sex shall include ... sexual harassment." Mass.Gen.L. ch. 151B, § 18(1). Further, section 18(1) defines sexual harassment as including "sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature when," under subsection 1(18)(b), "such advances, requests or conduct have the purpose or effect of unreasonably interfering with an individual's work performance by creating an intimidating, hostile, humiliating or sexually offensive work environment." Mass.Gen.L. ch. 151B, § 1(18); *see Ramsdell v. Western Massachusetts Bus Lines*, 615 N.E.2d at 195.

■ The express language of subsection 1(18)(b) of chapter 151B speaks to *"unreasonably* [emphasis added] interfering with an individual's work performance," Mass. Gen.L. ch. 151B, § 1(18)(b), and, therefore, like Title VII, views the evidence of sexual "harassment from the view of a reasonable person in the plaintiff's position." *Gnerre v. Massachusetts Commission Against Discrimination,* 402 Mass. 502, 524 N.E.2d 84, 88 (1988); *accord Burman v. Boch Oldsmobile, Inc.,* 1995 WL 809940 at * 3 (Mass.Sup. Ct. April 11, 1995). In addition, there must be a showing that the work environment is subjectively offending to the plaintiff. That is, "an employee who alleges sexual harassment must show that the employer's conduct was intentionally or in effect hostile, intimidating, or humiliating *to the plaintiff* in a way which affected her performance...." *Ramsdell v. Western Massachusetts Bus Lines,* 615 N.E.2d at 196.

Turning to the case at bar and with Forsyth having identified the absence of evidence to support Dr. Mullenix' sexual harassment claim, Dr. Mullenix points to the following incidents of sexual harassment. First, in March 1993 Dr. Tanner laughingly told Dr. Mullenix to wear a short skirt during a lunch meeting.[68]

Second, Dr. Mullenix asserts that Dr. Van Houte asked her " 'point-blank, why should I get a paycheck when I have a husband to support me?' " (Docket Entry # 102, p. 18). Dr. Mullenix, however, extracts only a portion of the statement. When taken in context, it is apparent that Dr. Van Houte said that other staff members felt that Dr. Mullenix should not get a paycheck because she had a husband to support her.[69] The full testimony by Dr. Mullenix at her deposition reads as follows:

> That was also when he [Dr. Van Houte] made the statement about—asked me point-blank, why should I get a paycheck when I have a husband to support me? That he [Dr. Van Houte] didn't feel that way, but he guaranteed me that other

senior staff members of the staff would feel that way.

(Docket Entry # 98, Mullenix Deposition).

Dr. Van Houte's comment also fails to identify which senior staff members held such a belief. Consequently, there is insufficient evidence that these unidentified senior staff members participated in the April 19, 1994 senior staff members' meeting and influenced the Board of Trustees decision not to renew Dr. Mullenix' appointment. *See, e.g., Smith v. Stratus Computer, Inc.,* 40 F.3d 11, 14 & 18 (1st Cir.1994) (comment to the plaintiff by manager that the plaintiff "should not be overly concerned about losing her job since her husband was employed" irrelevant to issue of discriminatory animus given lack of evidence that the manager "made or influenced the decision to remove [the plaintiff] from her job").

Third, Dr. Mullenix contends that Dr. Taubman "called Dr. Mullenix 'hysterical' because he disagreed with her research." (Docket Entry # 102, p. 18). Dr. Mullenix recites Dr. Taubman's alleged statement while explaining what she said to Dr. Hay during a conversation a few days after giving a seminar on fluoride research. According to Dr. Mullenix, Dr. Hay mentioned that "Marty Taubman in particular was very irate about the data that was presented ... " and that "Marty Taubman had indicated that I was hysterical in my reporting." (Docket Entry # 98, Mullenix Deposition).

■ Dr. Taubman's statement, however, is devoid of any sexual connotation or harassment and hence does not contravene chapter 151B. The language of section 1(18) of chapter 151B begins with the first sentence defining the term "sexual harassment" as meaning "sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature...." Mass. Gen. L. ch. 151B, § 1(18); *see also Gnerre v. Massachusetts Commission Against Discrimination,* 402 Mass. 502, 524 N.E.2d 84, 88, n. 2 (1988) (dicta noting that, "the statute only requires that the unsolicited harassment be of a sexual nature" albeit discussing subsection 4(6) of

68. See footnote number 21 and the cases cited therein.

69. See footnote number 21 and the cases cited therein.

chapter 151B which contains language similar to subsection 4(1)).

With respect to Title VII, a reasonable person under such circumstances would not as a matter of law view Dr. Taubman's statement as severe, physically threatening or humiliating or even an offensive utterance. A reasonable person could only view the statement as a comment about Dr. Mullenix' research or her reporting with respect to the fluoride seminar she gave at Forsyth.

▪▪▪ Next, Dr. Mullenix proffers the treatment that Drs. Snapp and Dr. Denbesten experienced at Forsyth.[70] Assuming the propriety of considering these incidents as relevant to the hostile work environment claim, see *Lipsett v. University of Puerto Rico*, 864 F.2d 881, 904 (1st Cir.1988) (characterizing university's treatment of other female program members as admissible to support Title IX sexual harassment claim),[71] they are not sufficiently pervasive or severe as to Dr. Mullenix to alter the conditions of her employment and to create an abusive work environment. The frequency of the discriminatory conduct and the severity of such conduct are factors to consider in determining the existence of a hostile work environment. *Harris v. Forklift Systems, Inc.*, 510 U.S. at 22–24, 114 S.Ct. at 371. A mere offensive utterance such as the one uttered by Niederman on the telephone to Dr. Snapp and the even less offensive suggestion by Dr. Tanner to Dr. Mullenix to wear a skirt and the comment by Dr. Taubman indicating that Dr. Mullenix' reporting was hysterical are generally insufficient particularly in light of the relatively few number of utterances involved. *See Chamberlin v. 101 Realty, Inc.*, 915 F.2d at 783; *see, e.g., Prader v. Leading Edge Products, Inc.*, 39 Mass.App. Ct. 616, 659 N.E.2d 756, 759 (1996). In

other words, the absence of "physically threatening" conduct weighs in favor of finding a hostile environment. *Harris v. Forklift Systems, Inc.*, 510 U.S. at 22–24, 114 S.Ct. at 371. Moreover, the conduct directed at the plaintiff in *Morgan v. Massachusetts General Hospital*, 901 F.2d at 188, was more physically abusive and severe than the conduct directed at Dr. Mullenix. Considering the totality of the circumstances and these utterances taken as a whole, they do not sufficiently establish genuine issues of material fact of an objectively hostile or abusive environment at Forsyth.

▪▪▪ Where, as here, there is no physical abuse but simply the use of offensive suggestions such as to wear a skirt, that Dr. Mullenix need not be paid a salary because her husband had a job and/or that Dr. Mullenix' reporting was hysterical, it is important to recognize that subsection 1(18) of chapter 151B, like Title VII, "does not mandate 'clean language' in the workplace." *Prader v. Leading Edge Products, Inc.*, 659 N.E.2d at 759. Similarly, Dr. Niederman's use of offensive language to Dr. Mullenix' co-worker, Dr. Snapp, irrespective of the fact that such language was not directed at Dr. Mullenix, does not as a matter of law create "a work environment *pervaded* [emphasis added] by harassment or abuse." *College–Town v. Massachusetts Commission Against Discrimination*, 508 N.E.2d at 591. As recently clarified by the Massachusetts Court of Appeals, section 1(18) of chapter 151B does not ordinarily apply to the sporadic use of sexually offensive words in the workplace. *See Prader v. Leading Edge Products, Inc.*, 659 N.E.2d at 759 (citing *Moffett v. Gene B. Glick Company, Inc.*, 621 F.Supp. 244, 269–270 (N.D.Ind.1985)).[72]

---

70. *See* pages 28–30 *supra*.

71. The court in *Lipsett* held "that the Title VII standard for proving discriminatory treatment should apply to claims of sex discrimination arising under Title IX." *Lipsett v. University of Puerto Rico*, 864 F.2d at 897.

72. The court in *Prader* did not expressly state that sporadic or isolated harassment is not within the purview of section 1(18) of chapter 151B. But, in citing *Moffett* wherein the referenced

pages address the principle that sporadic and isolated harassment is insufficient, the court in *Prader* implicitly approved such a principle. Furthermore, the language at issue in *Prader* was far more offensive to a reasonable person and more pervasive than the language at issue in the case at bar. Nevertheless, the court in *Prader* affirmed the lower court's allowance of the employer's motion for summary judgment on the hostile work environment claim.

Dr. Mullenix' additional contention that Forsyth treated her differently from Dr. Niederman, an Associate Staff Member, with respect to promotional decisions is not persuasive. The fact that Forsyth required Dr. Niederman to write a letter of apology to Dr. Snapp for plagiarizing her work does not, together with the above circumstances, create a genuine issue of material fact that Forsyth had an objectively abusive or hostile work environment. Not only is it generally improper to consider a sample of one but it is also not the role of this court "to second-guess the business decisions of an employer." *Petitti v. New England Telephone and Telegraph Company*, 909 F.2d 28, 31 (1st Cir.1990). Finally, the fact that Forsyth's charter fails to expressly prohibit discrimination in employment on the basis of sex does not salvage the hostile work environment claim.

Having considered the entire record, summary judgment is appropriate with respect to Forsyth's liability for creating a hostile or abusive work environment under Title VII or for sexual harassment in violation of chapter 151B. Count V is therefore properly subject to dismissal.

## II. *PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON COUNTS III AND IV OF THE THIRD AMENDED COMPLAINT (DOCKET ENTRY # 96)*

Dr. Mullenix moves for summary judgment on the EPA claim in Count III and the MEPA claim in Count IV.[73] (Docket Entry # 96).

First, Dr. Mullenix argues that her job as a staff associate required the same degree of skill, effort and responsibility as the jobs of five other male staff associates, to wit, Ahern and Drs. Li, Ganeshkumar, Maiden and Dibart. In addition, according to Dr. Mullenix, her job as a staff associate constituted "work of like or comparable character" within the meaning of the MEPA. She also points to the lower salary which she received in 1993 and 1994 in comparison to the salaries received by each of the above noted male staff associates in the years 1993 and 1994.

Second, Dr. Mullenix contends that Forsyth cannot meet its burden of establishing the applicability of any one of the four defenses listed in the EPA. Dr. Mullenix asserts that the only reason other than gender which explains Forsyth's actions is that it acted in retaliation for Dr. Mullenix' seeking legal redress. Dr. Mullenix additionally claims that Forsyth cannot meet its burden of establishing that the pay differential was based on seniority, the only defense applicable to an MEPA claim.

Forsyth refutes Dr. Mullenix' arguments by contending that Dr. Mullenix' salary was, in fact, significantly higher than the salary of the aforementioned male staff associates in 1993. Forsyth asserts that, as a principal investigator, Dr. Mullenix set her own salary in each NIH grant application and, by listing her effort at only 50%, Dr. Mullenix cut in half the amount of monies available from the NIH grants to pay her salary. Forsyth therefore doubles Dr. Mullenix' salary before comparing it to the salaries of the above noted male staff associates.

More persuasively, Forsyth puts forth evidence that the duties and responsibilities of the five male staff associates differed from the duties and responsibilities of Dr. Mullenix. Consequently, Forsyth submits that Dr. Mullenix' job does not involve the same degree of skill and responsibility within the meaning of the EPA and/or comparable work within the meaning of the MEPA. In addition, Forsyth contends that any salary differential is grounded on factors other than sex.

As stated previously, "Summary judgment is appropriate when 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Barbour v. Dynamics Research Corporation*, 63 F.3d at 36–37 (quoting Rule 56, Fed. R.Civ.P.). The definitions of "genuine" and

---

**73.** Dr. Mullenix expressly limits the motion for summary judgment to "the Federal and State Equal Pay Acts, Counts III and IV." (Docket Entry # 96). Accordingly, notwithstanding Dr. Mullenix' argument that Forsyth terminated her in retaliation for seeking legal redress, Dr. Mullenix does not seek summary judgment on the retaliation claim in Count I.

"material", apply equally to Dr. Mullenix' motion, as they do to Forsyth's motion. In the context of Dr. Mullenix' motion, however, this court examines the record " 'in the light most hospitable to [Forsyth], indulging all reasonable inferences in [Forsyth's] favor." *Smith v. F.W. Morse & Company, Inc.,* 76 F.3d 413, 428 (1st Cir.1996). In so doing, this court disregards "conclusory allegations, improbable inferences, and unsupported speculation." *Smith v. F.W. Morse & Company, Inc.,* 76 F.3d at 428. " 'When facing cross-motions for summary judgment, a court must rule on each motion independently, deciding in each instance whether the moving party has met its burden under Rule 56.' " *Lewis v. Boston Redevelopment Authority,* 1996 WL 208473 at * 2 (D.Mass. April 4, 1996) (citation omitted).

This court need not repeat at length its discussion of what Dr. Mullenix must show in order to set forth a *prima facie* case that Forsyth paid different wages to employees of the opposite sex for substantially equal work. As noted previously, Dr. Mullenix must first demonstrate that Forsyth paid different wages to employees of the opposite sex. Referring to a "chart" comparing the salaries of the five staff associate to the salary of Dr. Mullenix in 1993 and 1994 (Docket Entry # 97, Ex. 1), Dr. Mullenix represents that there is no dispute regarding the wages paid to the male staff associates. (Docket Entry # 97, p. 14).

Although the proof required to support a summary judgment motion "need not necessarily rise to the level of admissible trial evidence, it must consist of something more than 'conclusory allegations ... and unsupported inferences.' " *Dow v. United Brotherhood of Carpenters,* 1 F.3d at 58 (citation omitted). Forsyth correctly characterizes the chart in exhibit 1 as a chalk. (Docket Entry # 125, n. 3). Although Dr. Mullenix attaches notes to the chart which cite to Forsyth's salary sheets to support some of the salaries noted in the chart, there is no indication that the underlying documents are too voluminous for court review. *See* Rule 1006, Fed.R.Evid.; *see also Gomez v. Great Lakes Steel Division National Steel Corpo-*

*ration,* 803 F.2d 250, 257 (6th Cir.1986) (explaining distinction between charts used as evidence and charts used as pedological devices). The chart, unsupported by Rule 56(c) documentation, is therefore nothing more than a chalk and cannot establish for summary judgment purposes that Forsyth paid male staff associates different wages than it paid Dr. Mullenix.[74] Dr. Hay supplies certain salary information, however, by averring that Forsyth paid Ahern $35,895 in 1994, Dr. DiBart $30,479 in 1994 at 80% effort and Dr. Li $52,323 in 1994.

Even assuming that Dr. Mullenix adequately established that Forsyth paid the five male staff associates different wages than Forsyth paid Dr. Mullenix, she fails to show as a matter of law that she performed substantially equal work on jobs requiring equal skill, effort and responsibility. Forsyth had a hierarchy of different levels of staff associates. Forsyth is also comprised of different divisions. The job content of a staff associate at Forsyth can, viewing the record in Forsyth's favor, be seen as encompassing different laboratory research skills, different grant applications and awards, different levels of effort and different responsibilities inasmuch as Forsyth deemed certain research areas more valuable than other research areas. Genuine issues of material fact therefore exist as to whether Forsyth paid Dr. Mullenix less wages than it paid to male staff associates for substantially equal work and/or work of like or comparable character.

In addition, Forsyth submits more than adequate evidence to create a trial worthy issue that the differential, if any, was based on a factor other than sex. Dr. Hay attests at length about the reasons for Forsyth's differentiation in the wages paid to Ahern and Drs. DiBart, Ganeshkumar, Li and Maiden. (Docket Entry # 101, Ex. L). These reasons include differences in experience, education and, more importantly, skills which Forsyth deems useful to its mission.

Summary judgment in Dr. Mullenix' favor as to her EPA claim in Count III is therefore inappropriate. Summary judgment is also improper as to the MEPA claim in Count IV.

**74.** See footnote number 39.

Viewing the record in Forsyth's favor and for reasons similar to those stated in part I(4), it is for the finder of fact, first, to determine the comparability of the substantive content of the jobs and, second, to determine whether the two positions entail comparable skill, effort, responsibility and working conditions.[75]

### CONCLUSION

In light of the foregoing discussion, this court **RECOMMENDS**[76] that Forsyth's summary judgment motion (Docket Entry # 92) be **ALLOWED** as to Count V and otherwise **DENIED.** This court also **REC-OMMENDS**[77] that Dr. Mullerix' motion for summary judgment (Docket Entry # 96) be **DENIED.**

---

**75.** Accordingly, it is unnecessary to address Forsyth's seniority defense.

**76.** Any objections to this Report and Recommendation must be filed with the Clerk of Court within ten days of receipt of the Report and Recommendation to which objection is made and the basis for such objection. Any party may respond to another party's objections within ten days after service of the objections. Failure to file objections within the specified time waives the right to appeal the district court's order. *United States v. Escoboza Vega,* 678 F.2d 376, 378–79 (1st Cir.1982); *United States v. Valencia–Copete,* 792 F.2d 4, 6 (1st Cir.1986).

**77.** See the previous footnote.